WESTERN RY. OF ALABAMA v. RAILROAD COMMISSION OF ALABAMA et al.

CENTRAL OF GEORGIA RY. CO. v. SAME.

(District Court, M. D. Alabama, N. D. May 27, 1912.)

Nos. 265, 261.

1. CARRIERS (§ 12*)—STATE REGULATION OF RATES—REASONABLENESS OF RATES—RETURN ON INVESTMENT.

Under the conditions attending the business of railroads in Alabama, a railroad company is entitled to earn a net profit of 8 per cent. on the value of the property devoted to the service, where its charges are just and reasonable in themselves, and a schedule of rates fixed by law on intrastate business which will not permit a company to earn such return from that business is confiscatory and unconstitutional.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ ˙7–11, 15–20; Dec. Dig. § 12.*]

2. CARRIERS (§ 12*)—STATE REGULATION OF RATES—REASONABLENESS OF RATES—VALUATION OF PROPERTY.

In the valuation of the property of a railroad company for the purpose of determining the reasonableness of a state statute regulating rates, as affecting such property, a fundamental and generally control-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ling inquiry is the cost of reproducing the property in its existing condition at the time of the inquiry.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–11, 15–20; Dec. Dig. § 12.*]

3. CARRIERS (§ 12*)—STATE REGULATION OF RATES—REASONABLENESS—VALUE OF PROPERTY DEVOTED TO INTRASTATE BUSINESS.

In apportioning the total value of the property of a railroad company between its interstate and intrastate business for the purpose of determining the reasonableness and validity of a state statute regulating rates, the only feasible method is by comparison of the volumes of its revenues from each kind of traffic, making allowance for the greater relative cost of doing local business, varying in amount with varying conditions, and as to which the testimony of experts skilled in railroad transportation may be accepted.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–11, 15–20; Dec. Dig. § 12.*]

4. CARRIERS (§ 12*)—STATE REGULATION OF RATES—VALIDITY OF STATUTE.

A carrier has the right, if rates have been fixed too low in the past, to meet changed conditions by increasing them if the increase is reasonable, and a state statute, which denies it that right and forces it to continue in force rates which are unremunerative and confiscatory, is unconstitutional and void.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–11, 15–20; Dec. Dig. § 12.*]

5. CARRIERS (§ 12*)—STATE REGULATION OF RATES—VALIDITY OF STATUTE—BURDEN AND MEASURE OF PROOF.

In a suit by railroad companies to enjoin the enforcement of a state statute fixing rates on the ground, among others, that it made arbitrary classification of roads and was unconstitutional as depriving complainants of the equal protection of the laws, they are required to prove such allegation by a preponderance of the evidence only as in other civil cases.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–11, 15–20; Dec. Dig. § 12.*]

6. CARRIERS (§ 12*)—CONSTITUTIONAL LAW (§ 242*)—STATE REGULATION OF RATES—CONSTITUTIONALITY OF ALABAMA STATUTES—CLASSIFICATION—REASONABLENESS OF RATES.

Act Ala. Feb. 14, 1907 (Acts 1907, p. 104), fixing passenger rates, and Acts Nov. 23, 1907 (Acts Sp. Sess. 1907, pp. 91–159), known as the Eight Group Acts, which divide the railroads of the state into four classes and prescribe maximum freight rates to be charged by each class on certain commodities and that the rates in force January 1, 1907, shall constitute the maximum rates as to all other classes, and shall not be increased, as administered by the executive officers of the state, *held* unconstitutional and void as to complainant railroad companies on the grounds: (1) That the classification of roads was arbitrary and discriminatory and deprived complainants of the equal protection of the laws; and (2) because the rates prescribed and kept in force by such acts are confiscatory, it being shown that, under the rates previously in force which were not unreasonable in themselves, neither of complainants earned an average net income from its intrastate business exceeding 3 per cent. on the value of its property devoted to the service, and that under the statutory rates, after they were put in force, the earnings were still less.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–11, 15–20; Dec. Dig. § 12;* Constitutional Law, Cent. Dig. § 691; Dec. Dig. § 242.*]

In Equity. Suits by Western Railway of Alabama against the Railroad Commission of Alabama and others, and by Central of Georgia Railway Company against the same. On exceptions to report of spe-

cial master and final hearing. Exceptions overruled, and decrees for complainants.

See, also, 171 Fed. 694.

On the 25th of March, 1907, complainants and ten other railroad companies, seven of which shortly afterwards abandoned their contests because of a trade whereby the executive department of the state agreed to give them better rates, afterwards carried into effect by legislative and administrative acts, filed their bills in the circuit court to enjoin, among other things, the enforcement of the several statutes of this state which prescribed 2½ cents per mile as the maximum intrastate passenger rate, fixed the maximum intrastate rates for the transportation of 110 commodities or articles of freight, and made the rates in force on the 1st day of January, 1907, the maximum intrastate freight rates. The statutes were assailed on the grounds that the rates prescribed are confiscatory; that they deny to complainants the equal protection of the laws, in that the classification of the railroads, including those of complainants, for rate-making purposes, is purely arbitrary and unjustly discriminatory; and that the operation of the state rate statutes amounts to a direct regulation, by the state, of interstate commerce. The hearing for a preliminary injunction went over at the request of the respondents until the 8th of May, 1907, when a preliminary injunction was issued in all the cases, the respondents offering no evidence of any kind and stating in open court that they did not intend to appeal from the orders; the making of which, in the then posture of the cases, they admitted was inevitable. Seaboard Air Line Railroad Co. v. Railroad Commission of Alabama et al. (C. C.) 155 Fed. 792.

After these injunctions, an extra session of the Legislature was called, October 9, 1907, to convene November 7th thereafter, to deal with such of the complaining railroads as at the time of the assembling of the Legislature should still insist on their contests in the federal court. At the session so held the 110 Commodities Act was repealed, and in lieu of it a series of statutes were enacted fixing freight charges. These acts were known as the Eight Group Acts, and were approved November 23, 1907. Thereupon complainants in these cases filed supplemental bills, attacking the new acts as unconstitutional on the same grounds as those urged against the original acts. On the hearing for a preliminary injunction, on the proof submitted by the parties, the court, being of opinion from the evidence introduced, on the most unfavorable view which could be indulged against complainants, that it was manifest beyond any doubt that the operation of the reduced rates would be confiscatory, issued a preliminary injunction against the enforcement of these statutes, and some other statutes, since repealed or declared unconstitutional by the Supreme or this court, which were designed to evade or destroy the jurisdiction of the court, and to force the complainants who remained in the court to abandon their contests. Central of Georgia Railway Co. v. Railroad Commission of Alabama et al. (C. C.) 161 Fed. 997.

An appeal was taken to the Circuit Court of Appeals, which upheld the orders of this court regarding the statutes seeking to undermine its jurisdiction and to punish complainants for invoking it, but held, by a divided court, that the evidence presented in the shape of ex parte affidavits, in which manner both sides without hint of objection from either submitted the question, did not so strongly overcome the presumption indulged in favor of the reasonableness of rate statutes as to justify an injunction against the freight and passenger rates, before a test of the rates by an actual trial. Thereupon the complainants put the rates into effect. The cases were then referred to a special master to take and return the testimony and report his conclusions on the facts, and he was afterwards directed to report his conclusions on the law. The order of reference directed findings upon 31 inquiries bearing upon every matter which could possibly throw light upon the value of complainants' railroad and properties, the amount of their interstate and intrastate commerce, the value of their property devoted to each service, the net and gross incomes received therefrom, the original cost and present value of the properties involved, the cost of duplicating it in its con-

dition at the time of the inquiry, and the like. The investigations by Special Master W. S. Thorington in these cases, and by Special Master W. A. Gunter in the other rate cases lately decided in this court, have been as painstaking and skillful, and have covered a wider range and been more exhaustive and deliberate, perhaps, than in any prior rate investigation. These cases are now submitted for final decree upon the master's report and the evidence returned by him, in conjunction with the several exceptions to his findings.

Lawton & Cunningham, of Savannah, Ga., R. E. Steiner and Steiner, Crum & Weil, all of Montgomery, Ala., for Central of Georgia Ry. Co.

R. E. Steiner and Steiner, Crum & Weil, all of Montgomery, Ala., for Western Ry.

Robert C. Brickell, Atty. Gen., Samuel D. Weakley, and Henry C. Selheimer, both of Birmingham, Ala., for Railroad Commission and others.

JONES, District Judge (after stating the facts as above). Contrary to its earlier view, it is now the settled doctrine of the Supreme Court of the United States that a rate statute is obnoxious to the fourteenth amendment if its operation prevents the earning of just remuneration on the value of the property devoted to the service, although it yields some profit. To use the language of the Supreme Court in different cases where the issue arose, a legislative act to avoid conflict with the fourteenth amendment must not prevent the earning of compensation which is "adequate," "full," "just," and "reasonable"; or, to quote the words of one of the latest cases, "a fair return upon the reasonable value of the property at the time it is used for the public."

In Central of Georgia Ry. Co. v. Railroad Commission of Alabama et al. (C. C.) 161 Fed. 965, this court held, upon the facts then before it, that a carrier in Alabama should be permitted, without legislative interference, to earn above the costs of rendering the service, and its fixed charges, 8 per cent. upon the value of the property devoted to intrastate service, provided its charges are reasonable and the service is rendered without unjust discrimination. It was then said:

"The carrier is made by law an insurer of freight, and is required to use the highest degree of skill known to the art to prevent injury to its passengers. It must have and keep its equipment up to the standard of modern excellence. Necessity and policy alike demand that it maintain a sufficiently high standard of wages to attract and retain the services of competent and faithful men in all its departments. Its business is in a degree hazardous when best conducted, and shares for good or ill the fortunes of the communities and localities it serves, and it must maintain and increase its facilities as their wants require. In all of these matters its interests and those of the public are in a large sense, legally and morally, identical. If a schedule of rates does not permit the carrier to earn a sufficient income to properly discharge these duties, the rights of the public, as well as the private interests of the owners, are invaded. The right to remuneration for the cost of whatever is requisite to maintain its service so as to meet the just wants of the public and fully discharge the duties exacted of it by law is therefore as vital to the public welfare as to the well-being of the property owner, and when we state the rights of the carrier, and enforce them in that respect, it is only another mode of stating and enforcing the rights of the public." 161 Fed. 992.

The same considerations apply to the right to earn enough more than the cost of the service to enable the property owner to obtain just compensation for the value of the use of his property in the service.

The Railroad Securities Commission, appointed pursuant to the act of Congress approved June 18, 1910, reports:

"A reasonable return is one which under honest accounting and responsible management will attract the amount of investors' money needed for the development of our railroad facilities. More than this is an unnecessary burden. Less than this means a check to railroad construction and to the development of traffic. Where the investment is secure, a reasonable return is a rate which approximates the rate of interest which prevails in other lines of industry. Where the future is uncertain, the investor demands, and is justified in demanding, a chance of added profit to compensate for his risk. We cannot secure the immense amount of capital needed, unless we make profits and risks commensurate. If rates are going to be reduced whenever dividends exceed current rates of interest, investors will seek other fields, where the hazard is less or the opportunity greater. In no event can we expect railroads to be developed merely to pay their owners such a return as they could have obtained by the purchase of investment securities which do not involve the hazards of construction or the risks of operation."

The Interstate Commerce Commission, in Re Proposed Advance in Freight Rates, 9 Interst. Com. R. 413, discusses the question and asks:

"Ought not a railway be allowed to accumulate, in some form, a surplus during fat years which may tide over subsequent lean years?"

It answers its own question by saying:

"To this we unhesitatingly answer in the affirmative. In times like the present railroad companies should be allowed to earn something more than a mere fair return upon their investment."

In Willcox v. Consolidated Gas Co., 212 U. S. 48, 49, 29 Sup. Ct. 198, 53 L. Ed. 382, 15 Ann. Cas. 1034, the Supreme Court declared:

"There is no particular rate of compensation which must in all cases and in all parts of the country be regarded as sufficient for capital invested in business enterprises. Such compensation must depend greatly upon circumstances and locality. Among other things, the amount of risk in the business is a most important factor, as well as the locality where the business is conducted and the rate expected and usually received there upon investments of a somewhat similar nature with regard to the risk attending them. There may be other matters which in some cases might also be properly taken into account in determining the rate which an investor might properly expect or hope to receive and which he would be entitled to without legislative interference. The less risk, the less right to an unusual return upon the investments. One who invests his money in a business of a somewhat hazardous character is very properly held to have the right to a larger return without legislative interference than can be obtained from an investment in government bonds or other perfectly safe security."

## Eight Per Cent. a Reasonable Return.

[1] Applying these general remarks to the proper measure of return on the investment of the gas company—which was the matter before it—the Supreme Court held:

"That a rate which would permit a return of 6 per cent. would be enough to avoid the charge of confiscation, and for the reason that a return of such an amount was the return ordinarily sought and obtained on investments of that degree of safety in the city of New York"

It applied this rule to a corporation, which, as it says, "monopolizes the gas service of the largest city in America, and is secure against competition under the circumstances in which it is placed"—a business of which the court further remarks:

"So far as it is given us to look into the future, it seems as certain, as anything of such a nature can be, that the demand for gas will increase, and, at the reduced price, increase to a considerable extent. An interest in such a business is as near a safe and secure investment as can be imagined with regard to any private manufacturing business."

That the business of railroads in Alabama, which must not only increase their facilities as the just wants of the public demand and meet existing competition, but face also the contingency of the building of new roads which will invade their territory and traffic, and encounter the loss of revenue, at uncertain periods, from poor crops, or diminished production or movement of manufactures in depressed conditions of trade, and the prevalence of epidemics and the interruption of business and losses from strikes, floods, and the like, is a much more hazardous and uncertain business than that of the gas company, which the Supreme Court allowed a return of 6 per cent., is obvious. The Willcox Case is a controlling authority, to say nothing of numerous cases in state and lower federal courts, to the effect that, under the conditions attending the business of railroads here, any schedules of rates fixed by law, which will not permit the carrier, where its charges are just and reasonable in themselves, to earn a return of at least 8 per cent. per annum upon the value of the property devoted to the service, is confiscatory.

## Proper Mode of Ascertaining Value.

[2] The factors which must be considered in valuing a railroad are carefully stated in Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819. The value of property, unless it be of a kind which is frequently bought and sold and therefore has a market value, must always, to a large extent, be a matter of opinion. The controlling considerations are generally the use to which the property is or can be put, and the amount for which the property will sell for these purposes, or the profit which can be made from its use. Property with us is seldom taxed at its full value, and its assessed value for taxation may be an important, although not by any means a controlling, consideration. The price the owner paid for the property at the time he acquired it, if conditions are similar at the time of the inquiry, may also be of weight. A fundamental, and generally controlling, inquiry is: What will it cost to reproduce the property in its existing condition at the time of the inquiry?

In the several Rate Cases, 196 Fed. 820, heretofore decided by this court, the court held:

"The original cost of a railroad may in some instances reflect light upon, or even determine, the present value, as when it is of very recent construction. But ordinarily it is of little assistance in that regard, since many items of value may be donations by the government or individuals. * * * Or the road may have been built long before the period of the inquiry at greatly less or greatly higher prices than those prevailing at the time of the

inquiry. Or its original cost might be involved in obscurity and may include the cost of abandoned or destroyed portions of the property, which should not figure in the inventory for the present time, or the road may have been bought at a forced sale in times of panic at a nominal price or in inflated times at a corresponding price; or the road costing little originally, may have developed from many contributing causes into being property of great value. And in every case, after finding the original cost, when possible to be done, the question would still have to be solved as to whether such original cost is the same as the present value, which would involve the determination of the present value for such comparison independent of the original cost, and in no other or better way than on reproduction values."

In a report made by the Railroad Securities Commission to the President it is declared:

"A fundamental, though not necessarily a controlling, element in value, is cost of reproduction. This is true of property in general. It has been specifically affirmed of railroad property by the Supreme Court of the United States. Eminent railroad men who have appeared before this commission have stated that in their opinion cost of reproduction or physical value was the most important single element in determining the true value of a railroad as a whole."

### Value of Entire Property Used by Western Railway in Alabama.

The Western of Alabama Railway Company was organized in 1883 by the Central Railway & Banking Company of Georgia and the Georgia Railroad & Banking Company, which purchased the property of the old Western Railroad of Alabama and conveyed it to the Western Railway, for 3,000 shares of the capital stock of the par value of $100 per share, and the assumption of certain bonds due by the old Western Railroad of Alabama. At the time of the purchase, the Western Railroad owned not only the line of railroad from West Point, Ga., to Selma, Ala., but also what was known as the Columbus Branch, running from Opelika, Ala., to Columbus, Ga. The Railway Company subsequently sold this branch road to the Columbus & Western Railway, which under the terms of the sale paid a part of the contract price in cash and assumed certain of the outstanding bonds. The capitalization of the Western of Alabama Railway, for many years past, has been $3,000,000 of stock, and $1,543,000 of bonds which bear 4½ per cent. interest annually. Including about 300 feet of road in Georgia, which is properly treated as a part of the Alabama properties, the Western Railway of Alabama operates a railroad from West Point, Ga., through Montgomery, Ala., to Selma, Ala., a distance of 130.20 miles. With the exception of Opelika there are no towns of any size between West Point and Montgomery, or between Montgomery and Selma, and at each of these points it has competition in its interstate business which constitutes the greater part of its commerce. The lines of the Western of Alabama Railway are of an average age of 50 years or over, and the original cost of its construction is involved in obscurity. What it cost the present owners is shown by the price paid by them for it. Prior to 1907, improvements and betterments were charged to operating expenses, and we have no separate record of them; but afterwards, in compliance with instructions from the Interstate Commerce Commission, a record was kept, by which it appears that the amount expended in improvements and

betterments upon the property, since June, 1908, up to the latest practicable date before the closing of the testimony, was the sum of $595,-226.72. The proof leaves no doubt whatever that the road was worth what it cost the Western Railway at the time of the purchase in 1883. It has been managed skillfully and economically. In the language of the consulting engineer, who was one of the chief witnesses for the respondents:

"There is no road in the South that compares with it from an engineering standpoint and from a maintenance of way standpoint"—that the witness knew of.

### Reproduction Cost.

Naturally, with the development of the country since 1883, the road has greatly enhanced in value. The reproduction cost of the property, in its existing condition, being a fundamental element in arriving at the true value of the property, much evidence was adduced on that point. The master's report shows in great detail the pains taken to arrive at the true cost of everything which would enter into a duplication of the Western Railway. Frequent adjournments of his sittings were taken to give the parties opportunity to investigate and verify, from the books and records of the company, data and statistics furnished by their officers. Greater care could not have been taken, than was, to have full proof on these matters. The original maps and profiles by which a large part of the road was constructed were furnished engineers, and they made maps and profiles of other portions of the road. Every separate item of expense required to build the railroad, according to the maps and profiles, was enumerated and furnished the respondents, with the estimated cost of doing each part of the work. Much testimony was taken as to the time it would require to duplicate the road, the cost of excavations, fills, bridges, station houses, track laying, rails, spikes, assembling the workmen, material, etc., and the time required to reconstruct it, and also as to the number, kind, and cost of cars and equipment in use, and the percentage of depreciation from use of both roadway and equipment, and every separate parcel of right of way in country and town was enumerated, its value estimated, and proof taken thereon. No successful effort was made to shake the substantial correctness of these estimates, which were proved by the great weight of the testimony.

### Untenable Objections.

The chief objection was as to the value of the rights of way in the country. It was insisted that the method of arriving at the value of the country rights of way was erroneous because, in the estimates of the value of the land actually included in the right of way, an additional amount per acre was added for what is called "damage value," and the expense of acquiring or condemning the property, etc. The respondents insisted that the separate strips of land used for the right of way, should be valued at so much per acre, as where farm lands are sold in a body, and that the fact should be ignored in estimating the cost of reproduction, that a railroad must not only pay for the

value of the land actually taken for the right of way, but also the damages on account of the diminished value of the parcel not taken, in consequence of the construction of the road through the property from which the right of way strip was taken. It was shown by the decided weight of the testimony, and is also a matter of common knowledge, and has been frequently decided by the courts, that in estimating the cost of obtaining a right of way, the damage to the value of the land not taken, and the further expenses, such as the procuring of title, etc., are proper to be considered in addition to the market price of the land actually taken, in estimating the cost of reproducing the right of way. In the language of the Railroad Commission of the State of Washington:

"In order to reproduce the right of way used for railroad purposes, it is necessary to pay in addition to the market price of the land taken, prices ranging from such to 500 per cent. in excess thereof, to cover the consequential damages to the land not taken, and because of the necessities of the railroad company to have the particular land sought."

The value claimed by the complainant for the right of way in the country amounted to a little more than 10 per cent. of the total right of way values claimed by the railroad, and, as to the valuation of the rights of way in the country, the difference between complainant's and respondents' witnesses, the "damage value," etc., being eliminated, does not amount to more than $500. As to the value of lots used in towns and rights of way therein, no increased value was claimed on account of damages to adjacent tracts or lots, and respondents' witnesses fixed the value of the real estate and rights of way at Opelika, Montgomery, and Selma at a higher figure than claimed by the complainant.

The master found that the reproduction cost of the roadway and equipment (excluding in the computation the value of the intangible property, current assets, and "other real estate," not used in the business) was as follows: 1906, $5,206,371.69; 1907, $5,305,581.73; 1908, $5,476,490.59; 1909, $5,536,571.12; 1910, $5,657,140; 1911, $6,153,-483.02.

## Tax Valuations.

The proof shows that during these same years, with the exception of 1906, when the franchise or intangible values were not assessed, taxes were assessed on both physical property and tangible values at what was considered 60 per cent. of its real value, and that run out to 100 per cent. the tax value of the physical property and franchises was as follows: 1906, $4,074,242; 1907, $6,136,487; 1908, $6,136,687; 1909, $5,394,208; 1910, $5,651,142. The value of the franchise included in the above assessments was as follows: 1906, $1,626,661.50; 1907, $1,-626,661.50; 1908, $1,626,661.50; 1909, $876,446.66; 1910, $970,883.33. The average tax value of the property for the past five years prior to the closing of the evidence being $5,478,553. The value of "current assets" used in the business was not included in the property taxed, and amounted on the average during the period of the inquiry to $514,974.82 per annum.

The master, in view of all the evidence, very correctly found that

the average annual value of the entire property of the Western Railway of Alabama, devoted to or contributing to its entire business in Alabama during the six years prior to the closing of the testimony, was $6,963,208.

### How to Apportion Value of Property to Each Service.

[3] It is obvious that the property and equipment of a railroad, used indiscriminately in interstate and intrastate commerce, cannot be divided or split up so that we may select any given separate part of the railroad and its equipment as devoted exclusively to interstate or intrastate commerce. No such physical division is possible. The only feasible way in which the value of the property devoted to the use of intrastate commerce can be ascertained is first to find the value of the entire property employed in common in both interstate and intrastate commerce, and then to find by comparison of the volumes of its revenues in each business, or by some other measure, what proportion is used in each, and thus to arrive at the value of the property devoted to intrastate commerce. It has been repeatedly held by the Supreme Court:

"That the state cannot justify unreasonably low rates for domestic transportation considered alone, on the ground that the carrier is earning large profits on its interstate business, over which, so far as rates are concerned, the state has no control. Nor can the carrier justify unreasonably high rates on the ground that in that way it will be enabled to meet losses on its interstate business."

No intelligent person, at all familiar with our dual system of government, is ignorant of the truth that a carrier's profits from its interstate commerce cannot be included in its earnings from its domestic business, in determining whether the returns from the latter are confiscatory. Yet we frequently find men, sometimes thoughtlessly, and sometimes deliberately, seeking to delude public opinion, asserting that a decision pronouncing domestic rates unreasonable must be unjust and vicious, because the carrier, out of the combined earnings from its entire business, state and interstate, is enabled to declare sufficient dividends to keep its stock at or above par. No just person needs to be reminded that a decision on such a question cannot be unjust, because the court, in ascertaining the facts which must control its judgment, refuses to mingle earnings which the supreme law forbids to be intermingled. Every intelligent person is aware that the operation of a rate statute on a carrier's domestic business may not allow just compensation for the use of the property devoted to that service, and yet that it may earn sufficient profit from its interstate business to give its stock a rating, at or above par, in the markets of the country.

In the Rate Cases lately decided by this court, 196 Fed. 824, it was said:

"It is admitted that the allotment to interstate and intrastate commerce of the proper share of the propery used in common by the two is an exceedingly difficult problem, arising from the conceded fact that, though the units of service are the same in each, the relative aggregate cost of the two services is very different. If the ton and passenger miles were of uniform cost in

the two, of course, the share of each in the use of the property would be the proportion of the whole value which the gross earnings of each bear to the other, or the earnings of each to the whole earnings. But where two persons or patrons are served by a common property, one may do less business, but require in doing it the use of the property in a greater proportion than the other and therefore the relation of the respective services to each other can only be determined by first settling the relative cost of doing each business. Chicago, etc., v. Tompkins, 176 U. S. 179 [20 Sup. Ct. 336, 44 L. Ed. 417]. The difficulty of the problem arises from the fact that the cost of transportation involves an assessment on the subjects of commerce of charges to cover common, general, overhead, or nonhaulage expenses and also the haulage cost, and that there is no way of allocating such charges to the transportation items when the property is used in common. * * * It cannot be said what share of these common expenses shall be apportioned to an intrastate ton or passenger being transported, it may be, in the same train and car with the interstate tons and passengers. The solution of the question has heretofore been made to rest entirely on the experience and testimony of experts as to the relative difference in cost of the two services, and in every case in which the question has arisen the witnesses have, while agreeing on the fact that local or intrastate business is more costly than through or interstate business, varied very widely as to the amount of such differences"—according to the conditions under which the two businesses were conducted.

As the inquiry relates to what is a fair return upon the value of the property used in the different businesses, and the cost of doing the two businesses is not the same, it is manifest that the net earnings cannot be the same, and that to treat them as such and to apportion the value of the use of the railroad in intrastate business according to the gross earnings in interstate and intrastate commerce is to establish a wrong standard of remuneration for the use of the value of the property devoted to intrastate commerce. Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819; Chicago v. Tompkins, 176 U. S. 167, 20 Sup. Ct. 336, 44 L. Ed. 417. In the latter case the Supreme Court, speaking of the findings of the lower court to the effect that it could not determine the cost of the local business with mathematical accuracy, said:

"The statement is undoubtedly true, but there are many things which have to be determined by courts and juries, in respect of which mathematical certainty is not possible. * * * Beyond the figures given from the books of the company of the actual cost of doing the total business of the company, there was the testimony of several experts as to the relative cost of doing local and through business. Such testimony is not to be disregarded, simply because it cannot demonstrate by figures the exact amount or per cent. of the extra cost. That there is a difference is manifest, and upon such difference the opinion of experts, familiar with the railroad business, is competent testimony and cannot be disregarded."

Various rules have been followed by the courts and text-writers; but, as the master correctly observes, in all the cases since Smyth v. Ames, distribution of operating expenses has been effected in proportion to the gross revenue, with an extra load for local business varying in amount according to the varying conditions, and such distribution made by experts skilled in railroad transportation, with practical uniformity, has been accepted by the courts in ascertaining the value of the property the carrier devotes to its local business. In no case which the writer has examined has any testimony ever been given that the

cost of earning a dollar in intrastate traffic was less than 10 per cent. more on the dollar than the average cost of earning a dollar on all traffic, and in nearly all the cases the excess cost of doing intrastate business was shown to be far more. In the three Rate Cases, 196 Fed. 800, recently decided in this court, a method of ascertaining these expenses, without the use of a "load," in general, was formulated by Mr. W. A. Colston, on what is called the "Unit of Service Basis Equalized." The master in those cases found this method very useful in ascertaining the expenses of freight and passenger services, and their division between interstate and intrastate business, and the findings of the master using that plan, whose results were verified in other ways, were approved by this court. It would unduly swell this opinion to enter upon any discussion of the merits of the Unit of Service Basis Equalized as compared with the practice of adding a "load" to the cost of doing intrastate business. The special master did not think the Unit of Service Basis applicable in this case owing to the conditions with which he dealt, and found it inaccurate in some respects, when applied to the business of these complainants.

The master found that the revenue basis with a "load" of 10 per cent. more to earn a dollar in intrastate freight traffic than the cost of earning a dollar on all freight traffic, and of 5 cents more to earn a dollar on intrastate passenger traffic than the average cost of earning a dollar on all passenger traffic, was the proper basis for dividing the cost of operating expenses between interstate and intrastate traffic, and employed that method. He found that the actual value of complainant's property (excluding "other real estate," not used in the business) assignable to its intrastate business in Alabama was as follows: 1906, $2,315,983.11; 1907, $2,419,182.85; 1908, $2,438,666.42; 1909, $2,451,577.13; 1910, $2,369,273.70; 1911 (latest practicable date), $2,616,443.18.

He reported that the gross earnings of the complainant, in both interstate and intrastate freight and passenger traffic, were as follows: 1906, $1,126,105.39; 1907, $1,195,146.81; 1908, $1,143,550.21; 1909, $1,073,099.20; 1910, $1,167,402.61; 1911 (latest practicable date), $1,000,274.60.

He further found that its net income for the same years, from all of its business, state and interstate, was as follows: 1906, $347,416; 1907, $297,414.29; 1908, $134,721.62; 1909, $156,750.68; 1910, $222,068.42; 1911 (latest practicable date), $197,698.09.

He further found that the net intrastate income for those years was as follows: 1906, $84,434.93; 1907, $67,538.66; 1908, $17,329.47; 1909, $28,332.31; 1910, $45,165.23; 1911, $45,095.25.

Complainant's total net income from its intrastate business for the six years amounted to $287,895.85, or an average net income on all intrastate business of $47,982.64 per year.

The per cent. earned from its intrastate business for each of said years, on the value of the portion of the property devoted to intrastate business, was as follows: 1906, 3.65 per cent.; 1907, 2.79 per cent.; 1908, .711 per cent.; 1909, 1.16 per cent.; 1910, 1.91 per cent.; 1911, 1.72 per cent.

This is an average yearly per centum of 1.99 per cent., or 6 per cent. less than the remuneration complainant was entitled to earn, without legislative interference, under the Constitution and laws, from its intrastate business.

Neither the Passenger Rate Act, nor the 110 Commodities Act, nor the Eight Group Acts, went into effect on the lines of complainants until the 1st day of June, 1909, in consequence of the preliminary injunctions. In ascertaining the effect of either of those rates, the master has not been compelled to indulge in speculations of any sort, but has had the benefit of a knowledge of the conditions as they actually existed during the several periods anterior to June 1, 1909, and since then has seen the effect of the Passenger Rate Act and the Eight Group Act, by an actual trial of them for nearly two years more.

The rates in effect on the Western Railway, when the legislation complained of was enacted, were known as the "Company Rates." They had been in force since 1903, and remained in effect as to intrastate traffic until the Eight Group Acts and the Passenger Rate Act were put in force June 1, 1909. The master finds that the losses in earnings which the Western Railway would have sustained from April 1, 1907, to May 31, 1909, had the statutory rates been put into effect during that period, would have been as follows: For the fiscal year 1907, $38,265.46; for the fiscal year 1908, $38,292.11; for the fiscal year 1909, $48,321.94; for the fiscal year 1910 (from July, 1910, through April, 1911), $54,305.71.

The "Company Rates" permitted a free flow of freight and passenger traffic and had been accepted for years by the authorities and the public as reasonable. Indeed, two years prior to the enactment of the present rate statutes, the Railroad Commission of Alabama had made an exhaustive investigation of the reasonableness of the rates of the chief carriers then in force in Alabama, and decided that it had no power to reduce them, because those rates were not yielding to the carriers anything like a just return upon the value of the property devoted to their intrastate business.

Reduction of Rates Had No Appreciable Effect in Stimulating Passenger and Freight Traffic.

Much testimony was taken and many statistics offered as to the effect of the reduction of the rates in stimulating freight and passenger traffic. The witnesses were generally of the opinion that the reductions in the rates had no appreciable effect on the volume of traffic, and that such increase in traffic as has occurred since June 1, 1909, was simply a continuation of the normal increase in traffic resulting from the growth and general prosperity of the country. The proof bears out this conclusion, as well as the conclusion of the master that whenever there was an increase or decrease in interstate business it was reflected in intrastate traffic, and that as a general thing, with few exceptions:

"When tonnage and revenue in affected traffic (intrastate business) increased, they also increased in unaffected traffic (interstate business), and when they fell off in one, they fell off in the other."

It also appears that, in many periods when there was an increase in gross revenue, the ratio of operating expenses to gross revenues had so increased that there was less net profit than in other periods when the gross revenue was less. It is clear from the testimony that the reduction in rates has not stimulated the intrastate business of complainant, and certainly not to such an extent as to yield it a fair return on its property devoted to that service, when the former higher rates, which were reasonable and allowed by law, yielded an insufficient return.

### Rates Confiscatory by Any Standard.

Whether we fix the value of the entire property of the Western Railway at the amount which it was shown it would cost to reproduce it, or at the values at which it was assessed at taxation, or whether we adopt the Unit of Service Basis, or the method adopted by the master in these cases, to determine the value of the proportion of the whole property properly assignable to the intrastate business, or determine it in any other mode now known to the courts—even if we should reduce the values thus obtained by one-half, which no one will claim, in view of the evidence, could be done—it is perfectly manifest that the Western Railway's net earnings on the value of the proportion of the property devoted to its intrastate business would fall far below the amount necessary to relieve the rates of the charge of confiscation.

### Organization of Central of Georgia Railway Company.

The present Central of Georgia Railway Company was organized in November, 1895, pursuant to a plan of reorganization effected by Thomas and Ryan, who, under foreclosure proceedings, became purchasers of the main line and other railroad and properties of its predecessor, the old Central Railroad & Banking Company of Georgia, and afterwards conveyed them to the Central of Georgia Railway Company.

The total mileage of the Central System in Alabama and Georgia, including 4½ miles in Tennessee, at the time the master made his report, was 1,915.85 miles, and its capitalization at the time of the organization, including stocks and bonds which represented the then entire value of the system, was $54,410,000. The proof shows that the capitalization of the Central of Georgia Railway at the time of its organization was about the same as that of the old Central Railroad & Banking Company, and that the capitalization per mile of the old and new companies, including both stocks and bonds, at that time, was about the same, notwithstanding the receivers of the old company had put about $2,500,000 in improvements and betterments on the road from its earnings. The bonds and stocks of the old companies were less in amount than the cost of the property which passed from it to the Central of Georgia Railway Company. Since that time the value of the original property has increased, and the company has acquired other property, and its capitalization has increased to $53,-609,618, represented by property whose market value at the time the

master made his report was $64,350,362, or $10,750,744 in excess of the amount at which the Central's properties are now capitalized.

## Character of Line Operated in Alabama.

The lines owned and operated in Alabama by the Central of Georgia Railway and their mileage are as follows: From Girard to Andalusia, 136.82; Columbus (Phœnix City) to Birmingham, 155.27; Opelika to Roanoke, 36.12; Montgomery to Eufaula, 79.95; Eufaula to Ozark, 60; Lyerly-Dewey Branch, 2.52—making the total length of the lines owned in Alabama by the Central 470.38. It also operates the following leased lines in Alabama: From Henry-Ellen to Margaret, 10.62 miles; from Columbia to Lockhart, 91.47 miles; Alabama portion of line from Macon, Ga., to Eufaula, Ala., 1 mile; Alabama portion of line from Smithville, Ga., to Columbia, Ala., 1.40 miles. The total mileage of the lines operated under lease in Alabama is 104.39 miles, which with the owned miles makes the total mileage of the Central of Georgia Railway Company in Alabama 574.77 miles and a total mileage, as we have seen, of 1,915.85, in Alabama and Georgia. The proof shows that the affairs of the company have been economically and prudently managed.

The history of the several lines in Alabama, as shown by the evidence, amply justifies the master's statement:

"That most of these lines of road, by reasons of foreclosures and mergers, had a rather precarious existence before their absorption by the Central, and that none of them, with the exception of the Columbus-Birmingham Line, can be considered as having been very profitable or successful."

## Comparison Between Alabama and Georgia Part of System.

It was shown that, as compared with the remainder of the system operated in Georgia, these Alabama lines have not contributed to the general revenues, freight or passenger, or to the volume of business, as reflected in tonnage or passengers, in like proportion to the lines operated in Georgia. The proof shows that for the 12 months ending June 30, 1910, the intrastate freight revenue in Georgia was about six times greater than the intrastate freight revenue in Alabama, and that the interstate freight revenue in Georgia was about three times that of Alabama. The total transportation revenue, Georgia intrastate, was between five and six times that of Alabama. The number of tons of freight, Georgia intrastate, was between four and five times that of Alabama. The ton mileage revenue freight, Georgia intrastate, was something more than eight times that of Alabama. The number of revenue passengers, Georgia intrastate, was nearly twice greater than in Alabama, and so was the number of revenue passengers, Georgia interstate. The revenue passengers one mile, Georgia intrastate, was between four and five times greater than that of Alabama. The revenue passengers one mile, Georgia interstate, was nearly twice greater than that of Alabama. The ton mile revenue freight, Georgia intrastate, was something more than eight times greater than in Alabama. It appears, too, that:

"A very large part, if not the bulk, of the Central's freight business in Alabama is of a lower class according to freight classification than it is in Georgia."

## Method of Determining Part of Property Devoted to Intrastate Business in Alabama.

As the Central operates its railroads both in Alabama and Georgia, it is necessary, in solving the question whether the Alabama rates complained of are confiscatory, to ascertain what part of the revenue of the entire system is earned in Alabama, from both its interstate and intrastate commerce in Alabama; then, on the basis of the revenue earned in Alabama on both businesses, to determine what proportion of its entire property in Alabama is devoted respectively to its interstate and intrastate commerce in Alabama, and, that found, to determine whether the net income from intrastate commerce in Alabama, allowed by the statutes, permits the railroad to earn just compensation on the value of that proportion of its property in Alabama devoted to domestic commerce.

The data by which these questions can be satisfactorily answered are found in the proof before the master, and the manner in which the Central kept the accounts of the system. The proof shows that revenues of the Central earned wholly in Alabama, as from intrastate passenger and freight traffic, switching, storage, and car service in Alabama, were credited to that state. Revenue from interstate traffic earned wholly in Alabama was also credited to this state, and, where the revenue was derived from the service of the company in two states, it was divided on the basis of the haul in each state, on what is known as mileage pro rates. Revenue from the express business was divided in the same way. Revenue from mail routes was divided on the basis of the mileage of each particular route in each state. Revenue from freight and passenger, carried from one point in Alabama to another point in the state, was shown by the waybills, ticket sales, conductors' reports, etc. Freight and passenger business done in Alabama of an interstate character, where the terminal was situated in Alabama, was also easily ascertained. For illustration: In a shipment of freight originating in another state and destined to a point on the Central in Alabama, the entire service of the Central in such shipment is performed in Alabama, and the revenue was easily ascertained by the waybills, expense sheets, etc. Where a charge could not be allocated, for instance, the cost of superintendence common to both states, the expense was charged to the business in the different states in proportion to the mileage over which the superintendence was exercised. Repairs of steam locomotives were divided between the states on the basis of the mileage made in each state the previous month, except engine repairs for each locomotive are divided on the basis of the mileage made in each state since the last general repairs on the particular locomotive. These instances are merely cited for illustration; the classification being very voluminous and covering every separate expense.

To make a proper distribution of operating expenses between interstate and intrastate business, it was first necessary to make the dis-

tribution between freight and passenger business and its respective allied or derivative businesses. While it is generally recognized that no exact distribution of operating expenses between freight and passenger can be effected, still the Central kept this expense separate, currently with the rendition of the service, in its accounts, and the master adopted the proper method in arriving at the distribution, being the same method recommended by the Interstate Commerce Commission. After this division of operating expenses was made, the master made the division of operating expenses between interstate and intrastate commerce, on the basis of what has heretofore been explained as a "load" on the intrastate business as compared with all business, to ascertain the net income, from the intrastate business.

### Cost of Reproduction.

The cost of reproducing the lines of the Central of Georgia in Alabama, in their existing condition, being one of the fundamental elements in ascertaining their true value, the same careful method of ascertaining their reproduction cost was employed as in the Western Railway Case, set forth in a former part of this opinion. After taking voluminous testimony on the subject, the master found on all the evidence that the value of the property of the Central of Georgia Railway Company in all its business, state and interstate, in Alabama, including the value of the franchise, is $20,632,436.19. I concur with the special master that this finding is just and reasonable, "when there is also taken into consideration the character of the sections through which complainant's line of railway operates, the density of population and traffic, with their likelihood to increase or diminish, and the situation and relation of complainant's line with reference to other railroads in the state."

We are relieved, however, from analyzing the proof as to the correctness of this finding by an agreement of the parties. It was both proved and admitted that the state authorities assessed the property and franchises of the Central of Georgia in Alabama at only 60 per cent. of their supposed value, which run out to 100 per cent. would give the property of the Central System used in Alabama a valuation for the year 1908 of $15,566,169; for the year 1909, $15,575,383; and for the year 1910 a value of $15,811,917. Counsel for complainant, while insisting that the value of the property was much more, expressed a willingness to rest the issue as to the value of the property in Alabama, for the purposes of this suit, on the tax values run out to 100 per cent. Counsel for respondents assented to this mode of valuation, objecting, however, to including the value of the franchise, although not to the valuation placed upon it. Willcox v. Consolidated Gas Co., 212 U. S. 51; 29 Sup. Ct. 192, 53 L. Ed. 382, 15 Ann. Cas. 1034, settles that contention adversely to respondents.

### By Agreement Master Adopted Tax Value Which Was Less Than Market Value.

The master accepted that basis of ascertaining the value of complainant's property assignable to its business in Alabama, although of

opinion that it would result in a valuation considerably less than the value as shown by the proof, because the parties assented to that basis, and it would eliminate from the case all those disputed questions of fact which so often embarrass a correct ascertainment of the amount of the investment, and also because it was a very conservative estimate of the value. In this way the value of the property of the Central System, assignable to its business in Alabama, was reduced nearly $5,-000,000 from its value measured by the reproduction cost and other elements which must, generally, be taken into consideration in arriving at the value of railroad property. Smyth v. Ames, supra.

The master adopted the tax valuation with the franchise included, as stated above, and found that the value of the property employed in all the Central's business in Alabama for the years 1908 to 1910, both inclusive, was as follows: 1908, $15,566,169; 1909, $15,575,-383.10; 1910, $15,814,917. With a total net revenue from its entire business in Alabama in these same years as follows: 1908, $454,-730.81; 1909, $433,137.45; 1910, $434,760.20. Which was a return upon the value of its entire property in this state for the respective years, of 2.09 per cent., 1.88 per cent., and 1.93 per cent.

He further found that the value of the system in Alabama devoted to intrastate business for the years 1908, 1909, and 1910 was, respectively, $6,738,594.56, $6,294,012.27, and $6,034,972.32; and that the net earnings for those years, the taxes deducted, were, respectively $76,-700.92, $58,719.78, and $40,302.70, or a net return upon the value of the property in those years of .319 per cent., .056 per cent., and a deficit in the last year of $7,822.93.

### Amount of Losses from the Operation of Rates.

The master found from the testimony that the actual losses the Central of Georgia would have sustained had the Commodity Rate Act and the Eight Group Acts been in effect from April 1, 1907, to June 1, 1909, would have been $86,299.97, which was 8.72 per cent. of the whole revenue from all Alabama intrastate freight traffic. He also found that the Central of Georgia actually lost from June 1, 1909, to November 30, 1909, the latest practicable date before the closing of the testimony, $25,203.28, which was 12.24 per cent. of the whole revenue from all Alabama intrastate freight traffic affected by the rates for that period, as a result of putting the freight rates into effect. The master further found that the losses the Central of Georgia would have sustained had the 2½ cent passenger rate been in effect from April 1, 1907, to May 31, 1909, would have been $126,712.08, or about 12.30 per cent. of the passenger business affected. The master further found that the Central of Georgia actually lost on its intrastate passenger business from June 1, 1909, to November 30, 1909, by reason of putting the 2½ cent passenger rate into effect was $38,036.08, which was 13.76 per cent. of the intrastate passenger business for that period. The master also found that from December 1, 1909, to June 30, 1910, the latest practical date before the closing of the testimony, the Central of Georgia actually lost by reason of putting into

effect the 2½ cent passenger rate on its intrastate passenger business, $35,631.80, which was 14.99 per cent. of the traffic affected.

### Rates Are Confiscatory.

It is needless to say that the Constitution does not guarantee any profit to a carrier under any and all circumstances, but it does protect the carrier against legislative interference, which prevents the earning, if it can be done, of a fair remuneration upon the value of the property devoted to the service, so long as its charges are just and reasonable, and it serves the public without unjust discrimination, under the conditions existing at the time the charge is made. The rates in force, when the legislation here complained of was enacted, had been in effect for many years, and a large portion of them voluntarily adopted. In view of competition and the existing conditions they were reasonable. The country had prospered under them, and the free interchange of domestic commerce was not hindered thereby.

"What the company may choose voluntarily to do furnishes no criterion for the measurement of the power of the Legislature. Persons may voluntarily contract to do what no Legislature would have the right to compel them to do. Nor does it furnish a standard by which to measure the reasonableness of the matter exacted by the Legislature." Lake Shore & M. S. Railway v. Smith, 173 U. S. 684, 697, 19 Sup. Ct. 565, 43 L. Ed. 858.

Two years prior to the enactment of the present statutes, the Railroad Commission of Alabama, whose duty it is to inquire into such matters, found at that time under the then existing rates the complainant in this case was receiving a return of only 1.10 per cent. upon the value of its property devoted to its intrastate business in Alabama. An effort to increase the old rates, if conditions justified the increase, could not be defeated because the carrier had voluntarily adopted or acquiesced in the old rates. The Eight Group Acts and the Passenger Rate Act, however, prevented the carrier from earning what it could and would have otherwise done even under the old rates. No argument is needed to show that the amount of the losses, occasioned by the legislation forbidding the use of the old rates and compelling the carrier to charge the lesser rates prescribed by the later statutes, is that much taken from the amount complainant could have earned, and had a right to earn under the Constitution and laws, and is confiscatory of complainant's property to that extent. The difference, as we have seen, amounted to many thousands of dollars.

### The Maximum Rate Act.

[4] Little need be said, in addition to what has been said in the rate cases lately decided in this court, concerning the Act of February 11, 1907, which made the existing freight rates on January 1st of that year the maximum rates on all freight not included in other acts.

The proof shows that the rates at the date mentioned were unremunerative, and had been adopted to meet the circumstances and conditions which then surrounded the traffic, largely by the voluntary act of the carrier; and, although they were unremunerative and the result of the carrier's voluntary act, this would not prevent them from

being confiscatory when fixed by statute. Lake Shore, etc., Ry. v. Smith, supra. Had the carrier desired to conform to the Eight Group Acts, which affected only a part of its freight traffic, and to earn a fair remuneration on the rest of its freight business, by increasing the rates on the residue, which the proof shows were too low, this statute prevented it from doing so, although the increase might be reasonable, under the changed conditions. The argument of respondents that the rates, not affected by the Eight Group Acts, should be increased to prevent the operation of the Group Acts from being confiscatory, over- looks the fact that this act perpetuating the rates in force on January 1st prevents the carrier from doing so, and is in effect an admission that the Eight Group Acts themselves are confiscatory. The carrier certainly has the right, if rates have been fixed too low, in the past, to meet changed conditions by increasing them, if the increase be rea- sonable; and the statute in denying the carrier this right, and forcing them to continue in operation confiscatory rates, violates the Constitu- tion and is void.

## Classification Amounts to Denial of Equal Protection of the Laws.

[5] Apart from the unreasonableness of the rates, the classification, as made in the original acts and changed by subsequent legislative and administrative authority, denies to each of these complainants the equal protection of the laws. Neither in the statutes, nor in the an- swers to the original and supplemental bills which attacked the classi- fication, nor in the brief for the respondents, are the grounds stated upon which the classification was made; nor were any witnesses of- fered to sustain them. Respondents' counsel state that "they do not know on what particular basis the classification was made." They insist, however, that the presumption in favor of legislative action fur- nishes a sufficient reason for the classification, and that the complain- ants must prove the negative, that there was and is no just and ra- tional excuse or reason for the classification, with that particular de- gree of certainty required in the proof of a mathematical problem, and they in effect carry their contention so far as to require the proof to exclude by negation the existence not only of all substantial reasons, but of fanciful, immaterial, and even impossible data. In civil cases the evidence is sufficient if it produces a rational conviction, although it may not remove all doubt and uncertainty. Wood v. Brewer, 57 Ala. 515. The proper measure of proof in civil cases is reasonable conviction or satisfaction of the mind, and plaintiff has only to estab- lish his claim by the usual measure of proof required in civil suits according to the nature of the issue. Greenl. Evid. 78–80.

Respondents rest their contention on this point mainly on the au- thority of Dow v. Beidelman, 125 U. S. 691, 8 Sup. Ct. 1028, 31 L. Ed. 841, decided when the prevailing doctrine in the Supreme Court was that the Legislature might prescribe the maximum rates railroads should charge, and that its action in this respect was not subject to judicial review, so long as the rates prescribed permitted the earning of any profit. Without stopping to inquire whether that case has been overruled by Cotting v. Kansas City Stockyards Co., 183 U. S.

79, 104, 22 Sup. Ct. 30, 46 L. Ed. 92, it suffices to say, if, as held by the Supreme Court at the time Dow v. Beidelman was decided, the Legislature was the sole judge of the reasonableness of rates, the result is inevitable that the Legislature is also the sole judge of the reasonableness of the classification, which is only one of the modes for determining what rates are reasonable in the particular case. The Supreme Court has long since overruled the old doctrine, in a number of subsequent cases, commencing with Chicago Railroad v. Minnesota, 134 U. S. 418, 10 Sup. Ct. 462, 702, 33 L. Ed. 970, and ending with Ex parte Young, 209 U. S. 123, 28 Sup. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, 14 Ann. Cas. 764. Dow v. Beidelman, in consequence, can no longer be accepted as authority as to the classification of railroads for rate-making purposes. Long before the Beidelman Case and those cited above, the Supreme Court announced the ruling, to which it has ever since adhered, that in whatever language a statute may be framed, its intent and constitutional validity must be finally determined by "its natural and reasonable effect" upon the right involved, in view of the situation to which the legislation is applied. Henderson v. Mayor, 92 U. S. 259, 268, 23 L. Ed. 543. But even Beidelman's Case required "the same rule to be applied to all railroads of the same class," in default of which the court held it to be a "denial of the constitutional provision securing to all the equal protection of the laws." Railroads are in the same line of business, and any discrimination between them in respect to the reward they are entitled to earn must rest upon some substantial difference in their relations which justifies the discrimination. 'As said in Cotting v. Kansas City Stockyards Co., supra:

"While recognizing to the full extent the impossibility of an imposition of duties and obligations mathematically equal upon all, and also recognizing the right of classification of industries and occupations, we must nevertheless always remember that the equal protection of the laws is guaranteed, and that such equal protection is denied, when upon one of two parties engaged in the same line of business under the same conditions burdens are cast which are not cast upon the other."

And again:

"While good faith and a knowledge of existing conditions on the part of the Legislature is to be presumed, yet to carry that presumption to the extent of always holding that there must be some undisclosed and unknown reason for subjecting that individual or corporation to hostile and discriminating legislation is to make the protecting clauses of the fourteenth amendment a mere rope of sand, in no manner restraining state acts. * * * Classification to relieve a law of the charge of a denial of equal protection cannot be made arbitrarily, but must be based upon some difference which bears a just, a proper relation to the attempted classification." Gulf, C. & S. F. R. R. v. Ellis, 165 U. S. 150–154, 17 Sup. Ct. 255, 41 L. Ed. 666; Southern Railway Co. v. Greene, 216 U. S. 400, 30 Sup. Ct. 287, 54 L. Ed. 536, 17 Ann. Cas. 1247.

Again, in Atchison, Topeka & Santa Fé Railway v. Matthews, 174 U. S. 104–106, 19 Sup. Ct. 612, 43 L. Ed. 909, the court said:

"On the other hand, it is also true that the equal protection guaranteed by the Constitution forbids the Legislature to select a person, natural or artificial, and impose upon him or it, burdens and liabilities which are not cast

upon others similarly situated.  *  *  *  Neither can it make a classification of corporations or individuals which is purely arbitrary, and impose upon such class special burdens and liabilities.  Even where the selection is not obviously unreasonable and arbitrary, if the discrimination is based upon matters which have no relation to the objects sought to be accomplished, the same conclusion of unconstitutionality is confirmed."

[6] For some years prior to the enactment of the statutes complained of, the relation of the Alabama railroads to the public had been much debated in the press, on the hustings, and in the legislative halls. It was asserted on the one hand, and denied on the other, that many of the railroads were charging exorbitant rates upon watered capitalization, that they exercised a pernicious influence in the political affairs of the state, and that they should be regulated in various ways. The platform of the dominant party, upon which were elected the Governor and members of the Legislature of 1907, demanded, among other things:

"Further legislation fixing reasonable freight rates, not to exceed the present freight rates in this state, and the establishment by law of a freight rate on all the articles of common manufacture, production, consumption and use, not to exceed the present classification and rate of such articles in the state of Georgia, which rate shall not be increased but may be reduced by the Railroad Commission of this state, or by the carriers themselves."

When the Legislature assembled in regular session, in obedience to what it esteemed the popular will, it enacted the statutes regarding the passenger mileage and the 110 Commodities Act, and among other statutes enacted one providing that any carrier contesting the reasonableness of the rates in a federal court, or which removed a case from the state to the federal court, should forfeit its right to do intrastate business, and that its permit in that event should be canceled by the Secretary of State, and that thereafter it should not be lawful for it to do intrastate business until the corporation paid to the Secretary of State "a sum in cash equal to $1/10$ of 1 per cent. of its capital stock."

### Southern Railway Yields Under Duress.

Before the Passenger Rate Act and the 110 Commodities Act went into effect, the chief railroads in the state, insisting that the rates were very unreasonable, filed their bills in the federal court to enjoin their enforcement. The preliminary injunctions then issued were not contested. The state authorities acquiesced in the view that the bills of complaint were not suits against the state, and that the court had jurisdiction. Pursuant to the power granted by the statute, the court, upon exacting indemnifying bonds for the protection of shippers and passengers, not only enjoined the statutes under its equity power, but suspended them, as provided in the state statutes, so that they were no longer in force pending a final decree, and their nonobservance could not be a violation of the laws of the state. In the latter part of July, 1907, the Southern Railway removed a case from a state court to the federal court at Birmingham. The twin companion of that statute had already been declared unconstitutional by this court, and a like statute was afterwards declared unconstitutional by the Supreme Court. No injunction had been asked concerning the en-

forcement of this statute, and, when the Southern Railway removed the suit, the state authorities took the position that it was in rebellion against the laws of the state, and could not do business between points in Alabama until its privileges were restored in accordance with the act heretofore recited. Accordingly, the state authorities threatened the arrest of its employés and the ruin of its business if it charged higher rates than those allowed by the statutes complained of or did any intrastate business, and the Railway Company under duress acceded to the demand of the state authorities to put the rates into effect without prejudice to its right to relief on the final hearing. On August 9, 1907, the Southern presented a petition to the court to allow it to put the rates in effect, in which it formally protested that it had not violated any law of the state in making the charges it did, or in removing the case, and that, while it realized the grave sacrifice it was making of its rights, it yielded solely "because of a proper sense of its duty to the peace and good order of Alabama."

Although none of the other railroads had violated the unconstitutional statute in question, and were all operating under the protection of the injunctions from this court, the executive authorities, contrary to their former position, then began to assert that the court was usurping jurisdiction and invading and insulting the sovereignty of the state by issuing the injunctions, and that it was the duty of sheriffs, solicitors, and other state officers to arrest and imprison the operatives of the different railroads, in defiance of the orders of the court, because they were committing offenses against the criminal laws of the state by charging more than the rates prescribed in the statutes, although the operation of the rates had then been enjoined and the statutes themselves had been suspended, in the very mode invited in the state's own statutes on a contest of rates. See facts stated in L. & N. R. Co. v. Railroad Commission (C. C.) 157 Fed. 944. It was announced that a special session of the Legislature would be called to meet November 7, 1907, to deal with the cases of the railroads which insisted on remaining in the federal court. Before the Legislature met, although the statutes then in existence prevented any increase in rates by the commission, an agreement was entered into by the Governor and the Southern Railway Company, the Alabama Great Southern, and the Mobile & Ohio Railroad, in substance that the roads named should have the right and authority to maintain a maximum passenger rate of 2¾ cents per mile, and that if any of said companies should thereafter, voluntarily or as the result of litigation, put into effect in Virginia, North Carolina, South Carolina, or Georgia, a maximum passenger rate of less than 2¾ cents per mile, such company putting in such less rate should put the same into effect in Alabama, except that in no event should a less maximum rate than 2½ cents per mile be put into effect. It was also, among other things, agreed that on and after the first day of December, 1907, the said railroad companies should have the right to charge and collect from points on their respective lines in Alabama, on the commodities named in the 110 Commodities Act, the same rates per mile as the said companies were then authorized to charge and collect from points to

points on their said lines in Georgia, etc.; that said companies should apply to this court for the dissolution of the injunctions in the pending causes; and that there should be no liability upon them or any of them growing out of the injunction bonds which they had given in the litigation; also, that no right or interest of the railroad companies named in the agreement should be affected adversely, in respect to the rates and matters covered by the agreement, by any legislation to be enacted at any special session of the Legislature held prior to the then next regular session; and that the Governor and the Railroad Commission should do all things necessary to protect the companies named in the agreement in respect of the matters and things therein.

When the Legislature convened in special session, it passed the Eight Group Acts, and a network of statutes intended to evade the Constitution, such as withdrawing any power from its own officials to enforce its own laws and other devices, with the avowed purpose of defeating any effective execution of the orders of the court, and to drive out of it, without a trial on the merits, such of the complainants as were unwilling to accept the terms offered the other railroads. These acts were declared unconstitutional in Central of Georgia v. Railroad Commission (C. C.) 161 Fed. 965, and their invalidity set at rest by the decision in Ex parte Young, supra.

### Further Negotiations with Other Railroads Giving them Increased Rates.

On November 18, 1907, the Governor entered into an agreement with the Seaboard Air Line Railway and the Atlanta & Birmingham Air Line Railway, which was similar to the agreement made with the Southern Railway, in which there was a provision that the two roads first named should be put in and maintained in at least as favorable a class as the Southern Railway, and should have the right to charge at least the same rates on all freight in the state as the Southern Railway Company should have the right to charge, and that the Railroad Commission of Alabama should so provide by appropriate orders and regulations. On November 21, 1907, the Railroad Commission of Alabama authorized the Southern Railway, the Alabama Great Southern, the Mobile & Ohio, the Seaboard Air Line, the Atlantic Coast Line, and the St. Louis & San Francisco Railroad to charge a maximum rate of 2¾ cents per mile. This order recited that the injunctions obtained by these railroads had been withdrawn, and that representations had been made by the railroads that the passenger rate of 2½ cents per mile put in by them was too low.

### Still Further Trades as to Rates.

On November 25, 1907, the Railroad Commission entered an order in which it was provided that the Southern Railway, the Northern Alabama Railroad, the Mobile & Ohio, the Seaboard Air Line Railway, and the Atlanta & Birmingham Air Line Railroad should, on December 1, 1907, put into effect the rates on freight on certain commodities as set out in the Southern Railway's Alabama Local Tariff 5–B, and that the rules and instructions specified in said tariff should

be the rules and instructions on said lines. This order followed the adjournment of the special session of the Legislature, at which the Eight Group Acts had been passed, and which authorized the Commission to reduce the rates and change the classification. On December 7, 1908, the Mobile, Jackson & Kansas City Railroad was by order of the Railroad Commission placed in the fourth class, with the understanding that the rates applicable to the fourth-class roads should apply on all articles set out in the Southern Railway Tariff, known as Local Tariff 5–B. The St. Louis & San Francisco was on April 7, 1908, by order of the Railroad Commission, changed from the first class under the Eight Group Acts to class 2, which order recited it was in ratification of a certain agreement made between the Governor and the Southern Railway. On December 3, 1907, the Governor entered into an agreement with the Atlantic Coast Line Railway similar to said agreement with the Southern Railway; the Eight Group Acts being in effect at the time the agreement with the Atlantic Coast Line was made. Under both the Commodity Act and the Eight Group Acts, the Atlantic Coast Line had been assigned to class 1. By one of the provisions in said agreement with the Atlantic Coast Line Railway Company said road was to be changed from class 1 to class 3, by which reclassification said railroad was permitted to charge 20 per cent. in class 3, instead of 5 per cent. in class 1, in addition to the standard rates.

### Every Railroad Which Abandoned Its Contest had Its Rates Increased While Those Who Maintained Their Contests Were Discriminated Against by Confining Them to Legislative Rates.

From this résumè it will appear that, while the 110 Commodities Act was subject to attack on the question of classification, it did not contain the striking evidences of unjust discrimination that are found in the Eight Group Acts and in the subsequent orders of the Commission. The Alabama Great Southern Railroad was originally in the first class; the Southern Railway was in the second class. When they withdrew their suits, they were both promoted by act of the Legislature to class 3 in which they could charge higher rates. When the Atlantic Coast Line withdrew its suit, it was promoted to the third class from the first class. When the Frisco withdrew its suit, it was promoted from the first class to the second, and when the Seaboard Air Line withdrew its suit, it was promoted to the third class. Every railroad which was willing to forego its constitutional right to test the validity of the rates in the courts thereupon received a promotion or the right to charge a higher rate. The only railroads which were not authorized by subsequent acts and orders of the Commission to charge higher rates than those originally prescribed were those which insisted on the prosecution of their rights under the Constitution in the federal court. Each of the contesting roads, in the midst of the constant bestowing of favors on other roads, was all the while left exactly where the 110 Commodity Act and the Passenger Rate Act left them.

### Intent of Acts of Public Officials Judged by Their Reasonable and Natural Effect.

With the motives of Legislatures and Governors the courts have no concern. They are not accountable for their motives to the courts. An illegal act may be done with a good motive, and a legal act with an improper motive. In both cases, so far as the courts are concerned, it is question of power—not motive. While the courts may not inquire into their motives, yet, where the right to life, liberty, or property is involved, in a justiciable matter, the validity of an act done by public officials will depend upon the "natural and reasonable effect" upon the right involved, and the authorities will be presumed to have intended the ordinary, direct, and natural consequences of their acts. The fact that a railroad contesting a rate in a court of justice withdrew its contest, while another insisted on maintaining its, cannot affect in one iota any of the conditions upon which alone rates may be lawfully made. It does not alter the condition of the respective roads, or increase or diminish the cost of the service done by them, respectively, or the value of the property employed, or the amount or volume of the traffic, or the cost of maintenance, and cannot affect in the remotest degree whatever, directly or remotely, any element which can have any legitimate influence in determining whether its charges are reasonable, or the classification in which it shall be put as regards a contesting and a noncontesting road. The intent of the authorities in making the distinctions we have seen between the roads which contested and those which abandoned their contests, judging according to all laws human or divine, could have been no other than to use the power of the state to confer favors and rewards, in the matter of rates, upon the roads which abandoned the protection of the court, and at the same time to inflict losses upon the roads which insisted on their constitutional rights, and to penalize them for resorting to a court of their country. It is manifest that the classification denied complainants the equal protection of the laws.

"Though the law itself be fair on its face and impartial in appearance, yet if it is applied and administered by public authority with an evil eye and an unequal hand, so as to practically make unjust and illegal discriminations between persons in similar circumstances material to their rights, the denial of equal justice is still within the prohibition of the Constitution." Yick Wo v. Hopkins, supra, 118 U. S. 356, 6 Sup. Ct. 1064, 30 L. Ed. 220.

### Statistics and Facts Showing Classifications Had No Support in Reason.

Apart from this consideration, the proof as to every matter which legitimately enters into the fixing of rates for railroads, such as its mileage, cost of construction, difficulty of maintenance, operating revenue and volume of traffic, and the like, shows that the complainants in these cases have been unjustly and arbitrarily discriminated against. For instance, the Southern Railway had an average mileage in Alabama of over a thousand miles in 1907–08 as compared with the Central's 576.41 in those same years. The total operating revenue of the Central for 1907 was $2,650,003.40, as compared with $5,511,549.95

for the Southern. The number of revenue passengers carried by the Southern in that same period was 1,389,141, against 938,115 for the Central for the same period. The Southern in 1907 carried 48,263,906 passengers one mile against the Central's 25,650,840. The number of tons of revenue freight carried by the Southern in 1907 was 5,782,820, as against 1,823,142 for the Central. The Southern in class 3 is authorized to charge 25 per cent. in addition to the standard rates, while the Central in class 2 is authorized to charge 20 per cent. in addition to. the standard rates. It also appears that. the Alabama Great Southern Railroad is operated under more favorable conditions than the Central, and it is a matter of common knowledge that practically all of its lines in Alabama, extending from the northeastern state line in De ·Kalb county to the western or southwestern state line in Sumter county, is a part of an important and long-established trunk line known as the "Queen & Crescent Route," extending from Cincinnati, Ohio, to Meridian, Miss., while as shown in the testimony, of the Central's lines in Alabama, only that from Birmingham, Ala., to Columbus, Ga., and that from Montgomery, Ala., to Eufaula, Ala., are parts of a main line. It appears from the proof that the Seaboard Air Line and the Atlantic Coast Line Railways are both in class 3. The Atlantic Coast Line with an average mileage operated during said period of 246.68 in 1908, as against 81.60 miles of Seaboard Air Line in 1907–08. The total operating revenue of the Atlantic Coast Line in 1907 was $1,476,640.33 and in 1908 $1,276,377.59, as against $289,601.36 for the Seaboard Air Line in 1907 and $274,-274.17 in 1908. The total operating revenues per mile of road of the Atlantic Coast Line for 1907 was $5,986.06 and for 1908 $5,169.82, and for the Seaboard Air Line $3,549.04 in ·1907 and $3,361.20 in 1908. That the total operating expenses of the Atlantic Coast Line in 1907 was $1,074,547.42 and for 1908 $930,734.26, and for the Seaboard Air Line in 1907 $268,567.95 and for 1908 $294,407.79. The total number of passengers carried by the Atlantic Coast Line in 1907 was 13,835,369 and for 1908, 14,162,315; and for the Seaboard Air Line in 1907, 4,407,985, and 4,713,124 in 1908. The number of tons of revenue freight carried by the Atlantic Coast Line in 1907 was 723,889, and for 1908, 631,802; and for the Seaboard Air Line in 1907, 276,307, and in 1908, 252,754. The number of tons carried per mile by the Atlantic Coast Line in 1907 was 74,746,605, and in 1908 60,477,575; and for the Seaboard Air Line in 1907, 21,800,514, and in 1908, 15,641,561. The number of tons carried one mile of road varied very little as between the two roads. It also appears from the testimony that the Atlantic Coast Line, which the testimony shows operates under conditions similar to, or more favorable than, those under which the Central operates, is, with the Seaboard Air Line, the Southern Railway, and the Mobile & Ohio, all of which are substantial roads, placed in class 3 with small roads such as the, Northern Alabama and the Mobile & Birmingham, which bear little or no comparison with them in any of the features which usually control the classification of railroads for ratemaking purposes.

This opinion is already longer than is desirable, and· it ʾis needless

to go into the evidence and statistics at length regarding the discrimination against the Western Railway. The master's report contains an elaborate comparison between the Western Railway and the Alabama Great Southern, giving, during the past 10 years, all the items as to mileage, passengers carried and freight tons moved, operating revenue, net revenue, and other conditions. The master reached the conclusion, which is fully justified by the facts stated in his report, that:

"There is no reason why the Alabama Great Southern should have been favored above the Western in the classification, and that the Alabama Great Southern could have been reasonably placed at least in the same class with the Western, if in fact the classification of the two roads, as it now exists, should not have been reversed by placing the Alabama Great Southern in class 1 and the Western Railway in class 2."

### As said by the Supreme Court of Pennsylvania:

"The presumption in favor of the prescribed rate is no more than the ordinary presumption in favor of the constitutionality of acts of the assembly. It has no special strength or sanctity, and in view of the public history of the passage of the act of 1907, without investigation, and in obedience to a popular agitation, * * * it might well be said that very slight evidence would rebut the presumption in this case." Penn. Railroad Co. v. Philadelphia County, 220 Pa. 100, 68 Atl. 676, 679, 15 L. R. A. (N. S.) 108.

### I concur with the master that:

"The conclusion seems irresistible, especially in the absence from the pleadings and testimony of any fact or facts pointing to a different conclusion, that the classification of the different roads in Alabama by statute and by the Railroad Commission acting for the state was made with reference to its influence and effect upon certain administrative policies in connection with the enforcement of the statutes in Alabama regulating rates and railroads, rather than upon any ground or grounds of classification having proper and actual relation to the subject."

### Courts Cannot Bend Their Judgments to Fit Political Exigencies.

While it has been necessary in passing upon the classifications to recite the history of the litigation and the situations resulting from it, because the classifications were evolved from them, the court has no desire to comment upon them otherwise. Perhaps at this distance from the events of those days, no one will now insist, as was then insisted, that the orderly operation of the Constitution of the Fathers, the supreme law of the land, "anything in the Constitution or laws of any state to the contrary notwithstanding," is a menace to the peace and happiness of Alabama; or that the federal court detracted from her rights or insulted her sovereignty, or intermeddled with her local affairs, because it entertained a complaint of deprivation of property without due process, at the instance of citizens of this and other states; or that suitors in its portals deserved condemnation as violators of the law for testing, in the courts of their country, the validity of statutes concerning their property rights; or that the court itself merited execration by servants of the state, because it administered the law of the land according to the constant teachings of that august tribunal which is the arbiter of the boundaries between

state and federal power. If any there be who still maintain such beliefs, the answer is found in the words of Lord Mansfield:

"The Constitution does not allow reasons of state to influence our judgments. God forbid it should! We must not regard political consequences, howsoever formidable they might be; if rebellion was the certain consequence, we are bound to say, 'Fiat justitia, ruat coelum.' We are to say what we take the law to be; if we do not speak our real opinions, we prevaricate with God, and our own consciences."

It results from what has been said that the respective exceptions of the parties to the master's reports must be overruled and the reports confirmed, and that a perpetual injunction issue against the enforcement of the statutes complained of, with leave to the defendants, "when the circumstances change so that the rates involved in this case shall yield to the complainants reasonable compensation, to apply to the court by petition or otherwise for a further order in that behalf," and to that end, and for that purpose, the court retains jurisdiction of the causes. Smyth v. Ames, 169 U. S. 550, 18 Sup. Ct. 418, 42 L. Ed. 819.

Counsel may prepare and present drafts of decrees in conformity with this opinion.