# CHICAGO, MILWAUKEE AND ST. PAUL RAILWAY COMPANY v. TOMPKINS.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF SOUTH DAKOTA.

No. 181. Argued October 31, November 1, 1899. — Decided January 22, 1900.

The State of South Dakota having passed an act providing for the appointment of a board of railroad commissioners, and authorizing that board to make a schedule of reasonable maximum fares and charges for the transportation of passengers, freight and cars on the railroads within the State, provided that the maximum charge for the carriage of passengers on roads of the standard gauge should not be greater than three cents per mile ; and that board having acted in accordance with the statute, and having published its schedule of maximum charges, the Chicago, Milwaukee and St. Paul Railway Company filed the bill in this case in the Circuit Court of the United States for the District of South Dakota, seeking to restrain the enforcement of the schedule. The railroad commissioners answered fully, and testimony was taken before an examiner upon the issues made by the pleadings. This testimony was reported without findings of fact or conclusion of law. The case went

to hearing. The Judge, without the aid of a master, examined the pleadings and the mass of proof. He made findings of fact and conclusions of law; delivered an opinion; and rendered a decree dismissing the bill. This court is of opinion:

(1) That neither the findings made by the court, nor such facts as are stated in its opinion, are sufficient to warrant a conclusion upon the question whether the rates prescribed by the defendants were unreasonable or not, and that the process by which the court came to its conclusion is not one which can be relied upon;

(2) That there was error in the failure to find the cost of doing the local business, and that only by a comparison between the gross receipts and the cost of doing the business, ascertaining thus the net earnings, can the true effect of the reduction of rates be determined;

(3) That the better practice would be to refer the testimony, when taken, to the most competent and reliable master, general or special, that can be found, to make all needed computations, and find fully the facts ; so that this court, if it should be called upon to examine the testimony, may have the benefit of the services of such master.

ON February 3, 1897, the legislature of South Dakota passed an act relating to common carriers. Laws of 1897, c. 110. The act provided for the appointment of a board of railroad commissioners, and by section 20 this board was authorized to make a schedule of reasonable maximum fares and charges for the transportation of passengers, freight and cars on the railroads within the State. There was a proviso in the section that the maximum charge for the carriage of passengers on roads of standard gauge should not be greater than three cents per mile. On August 26, 1897, the board of railroad commissioners, having taken the preliminary steps required by the statute in respect to notice, etc., made and published its schedule of maximum charges for the control of all local railroads. On the next day the Chicago, Milwaukee and St. Paul Railroad Company, plaintiff and appellant, filed its bill in the Circuit Court of the United States for the District of South Dakota, seeking to restrain the enforcement of such schedule. The bill alleged generally that the existing rates were fair and reasonable; that those established by the railroad commissioners were unjust and unreasonable; would not only fail to afford the plaintiff adequate compensation for

the services to be performed, but also would operate to deprive it of its property without just compensation. The railroad commissioners filed their answer on October 4, 1897, in which they alleged that the existing rates were extortionate and unreasonably high — in many instances so high as to prohibit the shipment of ordinary products; that the freight rates were much higher than those charged by the complainant company for similar services upon its lines of railway in other and adjoining States, being about ninety per cent higher than the rates charged in the State of Iowa; that the passenger rates were at least, twenty-five per cent higher than those charged by the plaintiff over its lines of railway in other States, and much higher than those charged by other railway companies for like transportation in other States. In addition to these matters the answer averred that the plaintiff and the Chicago and Northwestern Railway Company were owners of competing lines of railway, running westerly from Chicago and traversing the States of Illinois, Wisconsin, Minnesota and Iowa; that during the years from 1880 to 1883 as competing companies they constructed their lines of railway into and through that part of the then Territory of Dakota, now the State of South Dakota ; that at that time there were no people, business or industry to be accommodated or served by the construction of said lines of railway, and that the construction was not in response to any existing demand for the same, but was for the purpose of preëmpting and occupying the Territory in anticipation of its settlement and development; that a rapid occupation followed such extension of railroad lines, and a large immigration flowed into the Territory; that this rapid immigration ceased in 1884, and that many of the settlers disappeared in the years following, so that in certain portions of the Territory there was almost a depopulation; that going in thus early the plaintiff acquired its right of way, depots and terminal grounds at a substantially nominal cost; that the capitalization of the railroad, in stocks and bonds, was fixed during this period of excitement and rapid immigration, had never been changed, and was extravagantly high. The answer also contrasted the value of

the property as shown by such capitalization in stocks and bonds and that returned by the railroad company to the State for the purposes of taxation. It also averred that the Dakota lines were of much greater earning value to complainant than the mere *pro rata* mileage of the lines in that State would indicate, and that no account had been taken or allowance made for the value to the plaintiff of the long haul business done on other parts of its lines afforded by the interstate business running into Dakota. Upon the issue thus presented by these pleadings testimony was taken before an examiner. This testimony is preserved in the record, and amounts to several hundred printed pages. The examiner simply reported the testimony, without any findings of fact or conclusions of law. The case went to hearing before the District Judge, who, without the aid of a master, examined the pleadings and this volume of testimony, and, on July 20, 1898, rendered a decree dismissing plaintiff's bill. 90 Fed. Rep. 363. Besides delivering an opinion, the court made the following findings of facts and conclusion of law:

" This cause came on to be heard upon the pleadings and proofs at this term and was argued by counsel; and thereupon, upon consideration thereof, the court finds the following facts:

" I. That the value of complainant's property in the State of South Dakota is ten million dollars.

" II. That the fair value of the proportion of complainant's said property assignable to local traffic was, for the year ending June 30, 1894, $2,200,000, and for the year ending June 30, 1895, $2,600,000, and for the year ending June 30, 1896, $2,100,000, and for the year ending June 30, 1897, $1,900,000.

" III. That the gross local earnings of complainant in the State of South Dakota for the fiscal year ending June 30, 1894, was $407,606.35, and for the year ending June 30, 1895, was $330,642.85, and for the year ending June 30, 1896, was $328,105.95, and for the year ending June 30, 1897, was $311,085.42.

" IV. That the local earnings on the complainant's lines under existing tariffs, on the same proportion of the total

value of the roads in South Dakota as the local earnings bear to the gross earnings from all sources in South Dakota, were: For the year 1894, 18.5 per cent; for the year 1895, 12.7 per cent; for the year 1896, 15.6 per cent; for the year 1897, 16.3 per cent.

" V. That applying the schedule of rates sought to be enjoined in this action to the local traffic during the years above mentioned, on the same method of calculation, the value of complainant's property assignable to local traffic would be for the years ending June 30, 1894, $1,900,000; June 30, 1895, $2,300,000; June 30, 1896, $1,800,000; June 30, 1897, $1,600,000.

" VI. Under the commissioners' schedule the gross earnings from local traffic would have amounted to the sum of $342,381.98 for the year ending June 30, 1894, and $277,518.40 for the year ending June 30, 1895, and $275,607.79 for the year ending June 30, 1896, and $261,295.21 for the year ending June 30, 1897.

" VII. That these earnings for the fiscal year 1894 would equal 18% of the value thus ascertained, and for the year 1895 would equal 12.1%, and for the year 1896 would equal 15.3%, and for the year 1897 would equal 16.2%.

" VIII. That owing to the small difference between the percentage earned under the complainant's schedule of rates and fares and the commissioners' schedule of rates and fares for the four years prior to the commencement of this suit, and owing further to the amount of the percentages which would have been earned during said four years under the commissioners' schedule, the court is unable to find beyond a reasonable doubt that the local earnings under said commissioners' schedule would not during the years aforesaid have earned the reasonable cost of earning said local earnings and some reward to the owner of the property over and above said cost of operation.

" IX. That the court is unable to find from the testimony what the actual cost of earning the local earnings for the fiscal years ending June 30, 1894, 1895, 1896 and 1897 was.

" X. As a conclusion of law the court finds that the enforcement of the proposed schedule of reasonable maximum rates

and fares will not deprive the complainant of its property without due process of law or deprive it of the equal protection of the laws, or operate to take the property of complainant for public use without just compensation."

From the decree thus entered the plaintiff took its appeal to this court.

*Mr. A. B. Kittredge* and *Mr. George R. Peck* for appellant.

*Mr. T. H. Null* and *Mr. John L. Pyle* for appellees. *Mr. W O. Temple* was on their brief.

MR. JUSTICE BREWER delivered the opinion of the court.

Few cases are more difficult or perplexing than those which involve an inquiry whether the rates prescribed by a state legislature for the carriage of passengers and freight are unreasonable. And yet this difficulty affords no excuse for a failure to examine and solve the questions involved. It has often been said that this is a government of laws and not of men; and by this court, in *Yick Wo* v. *Hopkins*, 118 U. S. 356, 369: "When we consider the nature and the theory of our institutions of government, the principles upon which they are supposed to rest, and review the history of their development, we are constrained to conclude that they do not mean to leave room for the play and action of purely personal and arbitrary power."

When we recall that, as estimated, over ten thousand millions of dollars are invested in railroad property, the proposition that such a vast amount of property is beyond the protecting clauses of the Constitution, that the owners may be deprived of it by the arbitrary enactment of any legislature, state or nation, without any right of appeal to the courts, is one which cannot for a moment be tolerated. Difficult as are the questions involved in these cases, burdensome as the labor is which they cast upon the courts, no tribunal can hesitate to respond to the duty of inquiry and protection cast upon it by the Constitution. *Railroad Commission cases*, 116 U. S. 307;

*Dow* v. *Beidelman,* 125 U. S. 680; *Georgia Railroad & Banking Co.* v. *Smith,* 128 U. S. 174; *Chicago, Milwaukee & St Paul Railway* v. *Minnesota,* 134 U. S. 418; *Chicago & Grand Trunk Railway* v. *Wellman,* 143 U. S. 339; *Reagan* v. *Farmers' Loan & Trust Co.,* 154 U. S. 362; *St. Louis & San Francisco Railway* v. *Gill,* 156 U. S. 649; *Covington &c. Turnpike Co.* v. *Sandford,* 164 U. S. 578; *Smyth* v. *Ames,* 169 U. S. 466.

It is often said that the legislature is presumed to act with full knowledge of the facts upon which its legislation is based. This is undoubtedly true, but when it is assumed from that, that its judgment upon those facts is not subject to investigation, the inference is carried too far. Doubtless upon mere questions of policy its conclusions are beyond judicial consideration. Courts may not inquire whether any given act is wise or unwise, and only when such act trespasses upon vested rights may the courts intervene. A single illustration will make this clear : It is within the competency of the legislature to determine when and what property shall be taken for public uses. That question is one of policy over which the courts have no supervision ; but if after determining that certain property shall be taken for public uses the legislature proceeds further, and declares that only a certain price shall be paid for it, then the owner may challenge the validity of that part of the act, may contend that his property is taken without due compensation; and the legislative determination of value does not preclude an investigation in the proper judicial tribunals. The same principle applies when vested rights of property are disturbed by a legislative enactment in respect to rates.

In approaching the consideration of a case of this kind we start with the presumption that the act of the legislature is valid, and upon any company seeking to challenge its validity rests the burden of proving that it infringes the constitutional guarantee of protection to property. The case must be a clear one in behalf of the railroad company or the legislation of the State must be upheld.

Such being unquestionably the law, it is obviously of the

utmost importance that the facts shall be clearly and accurately found and distinctly stated by the trial court, and that those facts shall sustain the conclusion reached.

We are of opinion that neither the findings made by the court, nor such facts as are stated in its opinion, are sufficient to warrant a conclusion upon the question whether the rates prescribed by the defendants were unreasonable or not, and we are also of opinion that the process by which the court came to its conclusion is not one which can be relied upon. The court proceeded upon the theory that a comparison of the actual gross receipts of the company from its South Dakota local business with those which it would have received if the rates prescribed by the defendants had been in force was sufficient to determine the question of the reasonableness of these latter rates, and instituted such comparison with respect to the four years preceding the commencement of this suit. Now, it is obvious that the amount of gross receipts from any business does not of itself determine whether such business is profitable or not. The question of expenses incurred in producing those receipts must be always taken into account, and only by striking the balance between the two can it be determined that the business is profitable. The gross receipts may be large, but if the expenses are larger surely the business is not profitable. It cannot be said that the rates which a legislature prescribes are reasonable if the railroad company charging only those rates finds the necessary expenses of carrying on its business greater than its receipts.

In the light of these general and obvious propositions we proceed to examine the computations and reasoning of the court. For reasons which will be apparent hereafter we do not stop to inquire whether its findings are correct deductions from the testimony, but take them as they are stated. It may be premised that the books of the plaintiff, showing its business for the four years, were examined, and so much as was deemed necessary admitted in evidence. From those books was disclosed with mathematical accuracy the gross receipts of the company on all its business in all the States during each of the four years and the actual cost of doing that business

during each of those years; also the gross receipts from the business done in South Dakota, and separately the amount which was received in that State from interstate business and that from local. If the schedule of rates prescribed by the defendants had been in force during the four years, and the same amount of business had been done by the company, the reduction in gross receipts from the passenger business would have been fifteen per cent, and from the freight business seventeen per cent. Of course, the cost of doing the business would be substantially the same. The court found the value of the plaintiff's property in South Dakota to be $10,000,000, although, according to the testimony, it was bonded for over $19,000,000. It held that it was not fair to consider that sum, $10,000,000, the value of the property employed in doing local business, for it was also used in doing interstate business; and that the true way to determine the value of the property which could be regarded as employed in local business was by dividing the total value of $10,000,000 in the same proportion that existed between the amount of gross receipts from interstate business and that from local business, each of which amounts was, as we have seen, accurately shown by the testimony. Upon that basis of division it found that the value of the company's property employed in local business was for the first year, $2,200,000; the second year, $2,600,000; the third year, $2,100,000; and the last year, $1,900,000, and also that the gross receipts from local business were for the first year, 18.5 per cent of the valuation; for the second year, 12.7 per cent; for the third year, 15.6 per cent, and for the last year, 16.3 per cent. In other words, for these several years the company received as compensation for doing its local business the per cent named of the real value of the property used in doing that business. Then, proceeding on the supposition that the defendants' schedule had been in force and the rates reduced as therein prescribed during these four years, it divided the valuation of $10,000,000 on the like proportion of the receipts from interstate business to the receipts from local business as thus diminished, and upon such division found that the valuation of the plaintiff's property engaged in local

business would have been, for the first year, $1,900,000; for the second year, $2,300,000; for the third year, $1,800,000; and the last year, $1,600,000; and upon such basis that the gross receipts from local business would have amounted to 18 per cent of the value of the property for the first year, 12.1 for the second, 15.3 for the third, and 16.2 for the last. Upon this it held that the difference between the per cent of receipts in the two cases was slight, and that there was no change in what may rightfully be called the earning capacity of the property sufficient to justify a declaration that the reduced rates prescribed were unreasonable. In other words, it was of the opinion that the earning capacity was so slightly reduced that it could not be affirmed that the new rates were unreasonable.

But that there was some fallacy in this reasoning would seem to be suggested by the fact that although the defendants' schedule would have reduced the actual receipts 15 per cent on the passenger and 17 per cent on the freight business, the earning capacity for the last year was diminished only one tenth of one per cent. Such a result indicates that there is something wrong in the process by which the conclusion is reached. That there was, can be made apparent by further computations, and in them we will take even numbers as more easy of comprehension. Suppose the total value of the property in South Dakota was $10,000,000, and the total receipts both from interstate and local business were $1,000,000, one half from each. Then, according to the method pursued by the trial court, the value of the property used in earning local receipts would be $5,000,000, and the per cent of receipts to value would be 10 per cent. The interstate receipts being unchanged, let the local receipts by a proposed schedule be reduced to one fifth of what they had been, so that instead of receiving $500,000 the company only receives $100,000. The total receipts for interstate and local business being then $600,000, the valuation of $10,000,000, divided between the two, would give to the property engaged in earning interstate receipts in round numbers $8,333,000, and to that engaged in earning local receipts $1,667,000. But if $1,667,000 worth

of property earns $100,000 it earns six per cent. In other words, although the actual receipts from local business are only one fifth of what they were, the earning capacity is three fifths of what it was. And turning to the other side of the problem, it appears that if the value of the property engaged in interstate business is to be taken as $8,333,000, and it earned $500,000, its earning capacity was the same as that employed in local business — six per cent. So that although the rates for interstate business be undisturbed, the process by which the trial court reached its conclusion discloses the same reduction in the earning capacity of the property employed in interstate business as in that employed in local business, in which the rates are reduced.

Again, in another way, the error of the court's computation is manifested. The testimony discloses that the operating expenses of the entire system during each of the four years were over 60 per cent of the gross receipts. If the cost of doing local business in South Dakota was the same as that of doing the total business of the company, then the net earnings of that local business would not exceed 40 per cent of the gross receipts. Reduce the gross receipts 15 per cent — and the reduction by the defendants' rates was 15 per cent on passengers and 17 per cent on freight business — it would leave only 25 per cent of the gross receipts as what might be called net earnings, to be applied to the payment of interest on bonds and dividends on stock. But the testimony shows that the cost of doing local business is much greater than that of doing through business. If it should be 85 per cent of the gross receipts (and there was testimony tending to show that it was as much if not more) then a reduction of 15 per cent in the gross receipts would leave the property earning nothing more than expenses of operation. These computations show that the method which the court pursued was erroneous, and that without a finding as to the cost of doing the local business it is impossible to determine whether the reduced rates prescribed by the defendants were unreasonable or not.

But here we are confronted by the ninth statement in the findings of fact, to wit, "that the court is unable to find from

the testimony what the actual cost of earning the local earnings for the fiscal years ending June 30, 1894, 1895, 1896 and 1897 was." If the court meant by that to say that there was no testimony tending to show what was the cost of doing local business, we are constrained to say that the statement is erroneous, because there was abundance of testimony bearing upon that question. If it meant simply that it could not determine that fact with mathematical accuracy, basing it upon testimony of the exact amount of money paid out for doing such work, it is undoubtedly true, but there are many things that have to be determined by court and jury in respect to which mathematical accuracy is not possible. Take the ordinary case of condemnation of real estate, the value is to be determined by the trial tribunal, whether jury or court, and yet no one is able to state the exact value. In this very case the court fixed the value of the company's property in South Dakota at $10,000,000, and yet it is impossible from the testimony to say that this conclusion was absolutely accurate, that there was testimony tending to show to a dollar such value. Beyond the figures given from the books of the company of the actual cost of doing the total business of the company there was the testimony of several experts as to the relative cost of doing local and through business. Such testimony is not to be disregarded simply because it cannot demonstrate by figures the exact amount or per cent of the extra cost. It is obvious on a little reflection that the cost of moving local freight is greater than that of moving through freight, and equally obvious that it is almost if not quite impossible to determine the difference with mathematical accuracy. Take a single line of 100 miles, with ten stations. One train starts from one terminus with through freight and goes to the other without stop. A second train starts with freight for each intermediate station. The mileage is the same. The amount of freight hauled per mile may be the same, but the time taken by the one is greater than that taken by the other. Additional fuel is consumed at each station where there is a stop. The wear and tear of the locomotive and cars from the increased stops and in shifting cars from main to side tracks

is greater; there are the wages of the employés at the intermediate stations, the cost of insurance, and these elements are so varying and uncertain that it would seem quite out of reach to make any accurate comparison of the relative cost. And if this is true when there are two separate trains, it is more so when the same train carries both local and through freight. It is impossible to distribute between the two the relative cost of carriage. Yet that there is a difference is manifest, and upon such difference the opinions of experts familiar with railroad business is competent testimony, and cannot be disregarded.

We think, therefore, there was error in the failure to find the cost of doing the local business, and that only by a comparison between the gross receipts and the cost of doing the business, ascertaining thus the net earnings, can the true effect of the reduction of rates be determined.

The question then arises what disposition of the case shall this court make. Ought we to examine the testimony, find the facts, and from those facts, deduce the proper conclusion?

It would doubtless be within the competency of this court on an appeal in equity to do this, but we are constrained to think that it would not (particularly in a case like the present) be the proper course to pursue. This is an appellate court, and parties have a right to a determination of the facts in the first instance by the trial court. Doubtless if such determination is challenged on appeal it becomes our duty to examine the testimony and see if it sustains the findings, but if the facts found are not challenged by either party then this court need not go beyond its ordinary appellate duty of considering whether such facts justified the decree. We think this is one of those cases in which it is especially important that there should be a full and clear finding of the facts by the trial court. The questions are difficult, the interests are vast, and therefore the aid of the trial court should be had. The writer of this opinion appreciates the difficulties which attend a trial court in a case like this. In *Smyth* v. *Ames, supra,* a similar case, he, as Circuit Judge presiding in the Circuit Court of Nebraska, undertook the work of examining the testimony,

making computations, and finding the facts. It was very laborious, and took several weeks. It was a work which really ought to have been done by a master. Very likely the practice pursued by him induced the trial judge in this case to personally examine the testimony and make the findings. We are all of opinion that a better practice is to refer the testimony to some competent master, to make all needed computations, and find fully the facts. It is hardly necessary to observe that in view of the difficulties and importance of such a case it is imperative that the most competent and reliable master, general or special, should be selected, for it is not a light matter to interfere with the legislation of a State in respect to the prescribing of rates, nor a light matter to permit such legislation to wreck large property interests.

We are aware that the findings made by the master may be challenged when presented to the trial court for consideration, and it may become its duty to examine the testimony to see whether those findings are sustained, as likewise if sustained by the trial court it may become our duty to examine the testimony for the same purpose. But before we are called upon to make such examination we think we are entitled to have the benefit of the services of a competent master and an approval of his findings by the trial court. As we have said, those findings may not be challenged by either party, and if so a large burden will be taken from the appellate court.

*For these reasons we not merely reverse the decree of the trial court but also remand the case to that court with instructions to refer the case to some competent master to report fully the facts, and to proceed upon such report as equity shall require.*