**NORTHERN PAC. RY. CO. v. HELVER-
ING, Commissioner of Internal Reve-
nue (two cases).**

Nos. 10299, 10300.

Circuit Court of Appeals, Eighth Circuit.

April 15, 1936.

M. L. Countryman, Jr., of St. Paul, Minn. (D. F. Lyons, of St. Paul, Minn., on the brief), for petitioner.

Harry Marselli, Sp. Asst. to the Atty. Gen. (Frank J. Wideman, Asst. Atty. Gen., and Sewall Key, and Morton K. Rothschild, Sp. Assts. to the Atty. Gen., on the brief), for respondent.

Before STONE, SANBORN, and BOOTH, Circuit Judges.

STONE, Circuit Judge, delivered the opinion of the court.

These are two petitions for review of redeterminations by the Board of Tax Appeals (here consolidated for hearing) of petitioner's corporate income taxes— one petition covering the years 1926 and 1927 and the other the year 1928. In so far as here pertinent, the taxes were assessed on the basis of the tax returns made by petitioner. The controversies arise out of claims for refund. The basis of the claims is that the statement, in the returns, of necessary maintenance and operating expenses for each of the years, was lower than it should have been, thus resulting in an undue raising of the taxable net income. The particular in which these expenses are claimed to be too low is that they were affected by a reduction on account of the expense of transportation over its own lines of workmen on and material going into new construction, and that this reduction was, for each of the years, larger than it should have been. The practical aspect of the matter is as follows: the smaller these transportation expenses, the greater the balance of general maintenance and operating expenses which constituted allowable deductions from gross revenue and therefore the smaller the taxable net revenue. There is no dispute that for income tax purposes these transportation expenses for construction should be deducted from the total maintenance and operating expenses (which include them).[1] The controversy is over the amount of such transportation expense in each of these years. A more particular statement of the situation and the issues here presented follows.

During these years petitioner made substantial capital additions through improvements and additions constructed by it. In the course thereof it transported, over its own lines, workmen used on and materials entering into such construction. The total transportation of workmen was equivalent of 9,455,755 men one mile; most of it being on regular trains without extra stops therefor. Ballast was transported on special trains; other material (329,649,455 net ton miles) on regular trains involving no special movement nor additional train miles. For all of the three years petitioner used a charge of 2 cents per passenger mile as representing the expense of transporting such workmen. For ballast, the charge used in 1926 and 1927 was 4 mills per ton mile. For other material a charge of 7 mills was used during 1926 and 1927 and during 1928 for such jobs as were in course at the beginning of that year. During 1928 a charge of 2.5 mills was applied to all materials (including ballast) as to all jobs begun that year. The books of petitioner were kept in accordance with the accounting system required by the Interstate Commerce Commission.[2]

[1] There could be no real dispute, as the expenses of such transportation are clearly a capital item. Duffy v. Central Railroad of New Jersey, 268 U.S. 55, 62, 45 S.Ct. 429, 69 L.Ed. 846; Great Northern Ry. Co. v. Commissioner, 40 F.(2d) 372 (C.C.A.8); Home Trust Co. v. Commissioner, 65 F.(2d) 532 (C.C.A.8); Colony Coal & Coke Corporation v. Commissioner, 52 F.(2d) 923 (C.C.A.4); Corning Glass Works v. Lucas, 59 App.D.C. 168, 37 F.(2d) 798, 799, 68 A.L.R. 736; Simmons Co. v. Commissioner, 33 F.(2d) 75 (C.C.A.1).

[2] The Classification of Operating Revenues and Operating Expenses of Steam Roads (prescribed by the Commission under section 20 of the Commerce Act as amended) provided that "the accounts prescribed for operating expenses are designed to show expenses of furnishing transportation service, including the expenses of maintaining the plant used in the service" and prescribed eight general operating expense accounts. One of such accounts was "(VIII) Transportation for Investment Credit." The Commission required that "the accounts for fixed im-

510

The results of applying the above charges were shown in these books kept by petitioner. The amounts so reached were added to capital and shown in general expense account "(VIII) Transportation for Investment Credit," and thus credited to the total expenses for operation, thereby reducing such expenses. In the income tax returns of petitioner for each of these years petitioner's stated deductions for maintenance and operation expenses consisted of the balances so arrived at.

In 1930 petitioner filed for refunds as to each of these years, claiming that the amounts thus reached as costs for such transportation of workmen and materials were excessive in so far as costs for materials (including ballast) exceeded 2.5 mills per ton mile and in so far as any cost of transporting workmen. Therefore that they were entitled to these differences as general expense deductions which would lower, in the same amounts, the taxable net revenue. The Commissioner disallowed these claims and was affirmed by the Board of Tax Appeals. Hence these petitions to review.

The attitude of the Board is expressed as follows:

"The parties agree that regardless of charges to capital, only the cost of transporting men and materials, over its own lines should be eliminated from the petitioner's operating expenses. They disagree radically, however, as to the method of computing such costs. The petitioner contends that the services rendered to itself consisted only in handling additional materials and men over its own lines and that the cost thereof was not a ratable proportion of all its operating expenses for the years in question, but only the cost out of pocket actually incurred in such transportation. In our opinion its purposed method of computing such costs does not conform to good accounting practices. In determining cost the general rule is that each unit of service or production must carry its proper proportion of all the operating expenses. We conclude, therefore, that the theory of 'cost out of pocket' as a basis for computing cost of transporting additional freight and passengers for capital purposes should be rejected.

"It is true, however, that petitioner should be required to eliminate from its operating expenses only the actual cost of transporting men and material for its own capital purposes. Such cost is a question of fact that must be established by convincing evidence. It may be presumed that the charges made against capital and eliminated from operating expenses by the petitioner in the taxable years represent the average cost of the services in question, if rendered to the general public, and the petitioner has adduced no evidence to the contrary. Its whole case depends either upon our acceptance of its 'out of pocket' theory of cost for additional services or upon proof that the amounts eliminated were in excess of the actual cost of the transportation in question as determined by standard cost accounting methods. The first we reject as unsound and the petitioner has failed to adduce convincing evidence that its elimination from operating expenses in the taxable years did not fairly represent the expenses incurred in transporting men and materials over its own lines for investment-credit purposes."

Petitioner argues three matters here, one[3] of which may be shortly eliminated. Of the other two, one was the rejection

provements and equipment shall include the cost of construction of such property." Also that such cost of construction should include "cost of transportation" which was defined as follows:

"Cost of transportation includes the amounts paid to other companies or individuals for the transportation of men, materials and supplies, special machine outfits, appliances and tools in connection with construction. Freight charges paid foreign lines for the transportation of construction material to the carrier's line shall be included, so far as practicable, as part of the cost of the material, when such charges are borne by the carrier. *A fair allowance representing the expense to the carrier of such transportation in transportation service trains over the carrier's own line also shall be included.* When the cost of such transportation is not assignable to specific work, it shall be included in account No. 43, 'Other expenditures—Road.' Amounts thus charged for transportation in transportation service trains over the carrier's line shall be credited to operating expense general account VIII, Transportation for Investment-Credit." (Italics ours.)

[3] At the conclusion of the memorandum of the Board and after it had stated the considerations which led to its results, it added a paragraph as follows:

"Except temporarily the conclusion here-

by the Board of petitioner's measure or method for determining the amount which should be allowed for expense of transportation, on its own lines, of these workmen and these materials for new construction. The measure pressed by petitioner was "the amount by which petitioner's operating expenses were increased by such transportation"—the so-called "out of pocket" expense. The second matter is that its evidence constituted substantial proof "of the maximum amount of expense that could have been added to its ordinary and necessary operating expenses by the transportation in question, and the refusal of the Board to make findings thereon was an arbitrary denial of justice and an error of law."

The position of respondent is that this petition presents the identical matter ruled by this court in Great Northern Railway Co. v. Commissioner, 40 F.(2d) 372, and therefore that decision is determinative of this controversy. Also that the determination of the Board was justified by the evidence before it and that the actual cost was not shown by the evidence introduced by petitioner in support of its "out of pocket" method.

A comparison of the above positions of the parties reveals that they are not confined to opposed positions upon precisely the same issues. This situation requires somewhat a treatment of the various matters contained in these two positions in so far as necessary to disposition of these cases. Such matters will be examined in as near a logical sequence as may be.

## The Great Northern Case.

If our above decision in the Great Northern Case is directly controlling, of course, there is no need to go further. We have examined the record (including the opinion of the Board) and the briefs in this court in the Great Northern Case. The general matter in contention there as here was the same. That matter was that the actual "out of pocket" expense of transportation on the company's lines for new construction purposes was the measure of the reduction allowable from general operating expenses; that the amount of such reduction was shown by the evidence introduced by the company; and that the book charge to the account "(VIII) Transportation for Investment Credit" was a purely arbitrary charge, not based upon nor intended to represent the actual cost of such transportation, and therefore not to be considered as evidence of such actual cost. Although this same broad situation was present both in that case and in these, the issues in the two litigations took very different directions. The opinion of the Board in the Great Northern Case clearly shows that the Board considered and determined the matter on the basis of actual cost of such transportation; that it based its determination upon the acceptance of the amount of such actual expense as adopted by the Commissioner (such being the amount shown by the company books under "(VIII) Transportation for Investment Credit") and the insufficiency of the evidence of the company to show a smaller actual expense.[4]

---

in results in no hardship to the petitioner. The amounts in controversy are invested in physical assets, the capital cost of which will all be recovered free from tax by allowance for depreciation ratably distributed over the useful life thereof. It does, however, secure a present advantage by charges to its capital structure as a basis for rate making. A contrary result would re-open the unbarred tax liability of every railroad in the country and result in endless confusion and litigation adverse to the revenues and to long continued administrative practice in their assessment and collection thereof. On this issue the determinations of the respondent are affirmed."

Petitioner argues that in this statement the Board "acted arbitrarily and without evidence in denying justice to petitioner because of considerations of expediency and administrative convenience." Reading of the entire memorandum convinces that the matters covered by this quotation had no real effect upon the determination of the Board, but were merely make-weight statements describing the broad practical effect which the Board conceived its decision (based on other matters) would have upon petitioner. Conceding, without determining, that this statement may have been misplaced, it is evident that it had no real effect upon the determination of the Board, and would therefore be no basis for an issue here.

4 The Board stated its conclusions as follows:

"Upon the basis of the testimony given by petitioner's general manager, a cost analyst, with twelve years' experience in railroad work, testified that the operating expenses of the petitioner for the year 1917 had been increased not more than $41,799.45 by the transportation of employees engaged in and construction material used in additions and improvements

When the matter came to this court, the main controversy was as to the propriety of treating the above book entry as evidence of actual value. It was here determined entirely upon that basis.[5]

In the present case the opinion of the

---

in transportation service trains. The method of the computation is detailed and no useful purpose would be served by setting it forth here, except that it should be noted that in the determination of the revised estimate only freight car repairs, fuel for yard locomotives, water for yard locomotives; fuel for train locomotives and water for train locomotives and train power produced have been taken into consideration.

"The classification accounts prescribed by the Interstate Commerce Commission permit the petitioner to charge to capital 'a fair allowance representing the expense to the carrier of such transportation in transportation service trains over the carrier's own line.' The petitioner's operating expenses claimed as a deduction from gross income were $422,677.80 in excess of the amount shown as its operating expenses in returns made to the Interstate Commerce Commission. The petitioner now admits that $41,799.45 of the $422,-677.80 was properly disallowed as a deduction from gross income by the respondent. We think that the evidence does not show that any part of the $422,677.80 was a proper deduction from gross income. That amount was the estimate made by the petitioner of the portion of its operating expenses which should be charged to capital when it made up its accounts for 1917. Apparently in the making of that estimate other cost factors were taken into consideration in addition to those used in computing the revised estimate of $41,-799.45. The latter figure has been computed upon the basis of the *additional cost* to the petitioner of transporting men and materials engaged in and used in construction work, but the account 'Transportation for Investment-Cr.' does not apparently have reference entirely to the additional cost to the petitioner of transporting men and materials so engaged. In our opinion, a part of the wear and tear of the train equipment of the rails, ties, etc., may be properly capitalized when men and materials for construction work are transported in transportation service trains. The evidence adduced does not convince us that the real cost to the petitioner of this transportation is the amount of $41,799.45. The disallowance of the deduction of $422,677.80 is therefore approved." 8 B.T.A. 225, 262.

[5] In that case [40 F.(2d) 372, at page 373] this court said:

"The claim of appellant is that the amount should be governed by the actual cost thereof and that such cost was far under the above sum, in fact, could not exceed $41,799.45. As a matter of principle and theory, this position is correct. However, it is very evident that the nature of such costs is such that it is impossible to even approximate them as a matter of fact. The appellant contends that it was put to no additional expense in transporting the few men at a time on a regular passenger train as this involved no additional equipment or service expense, because the trains upon which the transportation occurred would have been run in the same way whether these workmen were carried or not. A similar contention is made concerning the carriage of the material, except that appellant makes a rather grudging concession that the sum of $41,799.45 might be apportioned to this because of the cost of repairs to freight cars, fuel, and water for steam locomotives and electric power for electric locomotives. It hardly seems reasonable to say that the transportation of workmen which, in 1917, was the equivalent of 3,220,609 men one mile, did not cost the appellant anything or that the transportation of material for that year which was the equivalent of 65,076,446 ton miles, was nothing or practically nothing. The entire evidence and argument seem merely to show that there is an actual expense for transporting the men and material, but that the amount of such expense cannot possibly be ascertained with anything like approximation, but must be estimated rather vaguely. This difficulty is evidently what led the Commission to fixing a definite maximum which it would allow, without examination, for such purposes. Unquestionably, that maximum was the result of investigation and intended to represent an estimate of the average for such costs. This appellant adopted that maximum. According to its own evidence, it did so 'as representing reasonable allowances for the value of these services.' If there was an advantage in its selection of that basis, it got the advantage thereof in its capital account upon which its rates would be based. It cannot now say that such entry in its own books for that purpose is not competent evidence of the facts supposed to be represented thereby. The burden is upon it to show that such were less. This burden it has attempted to sustain. This presented a question of conflicting evidence before the Board of Tax Appeals, and we do not examine the verity of findings where such conflict exists.

"The determination of the Board as to this item should be sustained."

Board shows clearly that it regarded the prime issues as being (1) the measure or method for ascertaining the actual cost of this transportation for construction purposes and (2) whether the company had carried the burden of proof as applied to the measure which the Board approved. As to the first matter, the Board rejected the "out of pocket" cost measure urged by the company and approved a measure based on "the average cost of the services in question, if rendered to the general public." As to the second matter, it "presumed" that the book entries under "(VIII) Transportation for Investment Credit" represented "the average cost of the services in question, if rendered to the general public," and concluded that "the petitioner has failed to adduce convincing evidence that its elimination from operating expenses in the taxable years did not fairly represent the expenses incurred in transporting men and materials over its own lines for investment-credit purposes." These determinations of the Board present a situation and issues entirely different from the situation and issues determined by the Board and by us in the Great Northern Case. Therefore the Great Northern Case is not controlling of the issues here except as to matters, as to which it will be cited. We do not qualify nor depart from the opinion in the Great Northern Case, but we think that case determined issues different from those here presented.

## The Measure of Cost of Transportation for Construction.

While the precise issue presented by petitioner is the propriety of using its "out of pocket" expense measure to determine the expenses of transportation for construction purposes, yet that question necessarily involves broadly the determination of what is the proper measure. Although respondent puts forward no argument in support of any particular measure, the Board rests its determination that the "out of pocket" measure is improper upon the basis that the proper measure is the "average cost," if rendered to the public. Thus we have here two, and only two, measures presented. By the "average cost" measure is meant that the cost of workmen transportation is found by dividing the total passenger miles (revenue and nonrevenue) into the total passenger operating expenses, and the cost of construction material transportation is found by dividing the total freight ton miles (revenue and nonrevenue) into the total freight operating expenses. By the "out of pocket" cost is meant only that *additional* expense caused by the workmen traveling on regular passenger trains and the *additional* expense of carrying the construction materials in regular freight trains—by "additional" expense is meant that such regular passenger and freight trains run regardless of this transportation; that this transportation is merely so much added weight to be hauled; that only the actual outlay for hauling this additional weight should be considered. It is assumed by petitioner that this additional expense consists largely of "an additional amount of wear and tear of the train equipment, of the rails, ties and roadbed, and in the consumption of an additional amount of fuel, water and lubricants"; that is, an addition based on such expense items as are affected by volume of traffic.

By whatever method measured, the cost of this transportation is, for the most part, an indistinguishable portion of the entire expense of transportation of all passengers and all freight, respectively. This situation requires the use of some measure or formula by which the cost of this transportation for construction purposes may be estimated. Neither Congress nor (so far as we are informed) the Revenue Bureau has prescribed any such measure. Therefore we are driven to the ascertainment of such measure somewhat as an original proposition.

The taxing statutes involved here were designed to tax only the net revenue, which was to be ascertained by reducing the gross revenue by the deductions stated in those acts. One of such deductions was "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." Revenue Act 1926 (44 Stat. 9), § 234(a)(1), 26 U.S.C.A. § 23(a) and note, and Revenue Act 1928 (45 Stat. 791), § 23(a), 26 U.S.C.A. § 23(a) and note. This item of deduction was further defined and limited by the exclusion therefrom of capital expenditures. Revenue Act 1926, § 215(a)(2), 26 U.S.C.A. § 24(a)(2) and note, and Revenue Act 1928, § 24(a)(2), 26 U.S.C.A. § 24(a)(2) and note. These statutory provisions help us definitely only so far as declaring that such deductions for business expenses must be the actual expense of conducting the business less the

actual expenditures for improvements and betterments. What these actualities are and how they may be ascertained depend upon the particular business, and must be sought by consideration of such business.

The business here is that of a steam railway engaged in the public carriage of passengers and freight for hire. We are here concerned only with such features of that business, as are pertinent to the subject now under examination. Among these are the following:

(1) Aside from its public carriage of passengers and freight for hire, a railway frequently transports men and materials for its own purposes. In connection with the construction of betterments and additions it often furnishes such transportation. Such transportation is not in pursuance of its duties as a public carrier but as a private owner of property. Santa Fé, Prescott & Phœnix Ry. Co. v. Grant Brothers Const. Co., 228 U.S. 177, 186, 188, 33 S.Ct. 474, 57 L.Ed. 787. "The cost of such haulage is obviously an item of expense." Id., 228 U.S. 177, at page 186, 33 S.Ct. 474, 477, 57 L.Ed. 787. This cost has no relation to the cost of revenue traffic because the conditions governing the transportation of construction items are very different. New York, P. & N. R. Co., 97 I.C.C. 273, 289. "Commercial freight rates are based on a study of the average cost of hauling all freight in ordinary revenue operations, including that hauled under class rates and in less-than-carload lots. They are not, in our opinion, a reliable index of the cost of hauling ballast under construction conditions." Chicago, R. I. & P. Ry. Co., 24 I.C.C.(Val.Rep.) 709, 741.

(2) In charging for special or auxiliary services outside of mere transportation but associated therewith (such as refrigeration), only "out of pocket" rates are allowable. Refrigeration Charges on Fruits, etc., from the South, 151 I.C.C. 649, 652, 664; Refrigeration Charges from Florida, 85 I.C.C. 247; Railroad Commissioners of Florida v. Director General, 61 I.C.C. 438; Perishable Freight Investigation, 56 I.C.C. 449; Arlington Heights Fruit Exchange v. Southern Pac. Co., 20 I.C.C. 106.

(3) In determining validity of commodity rates under section 4 of the Interstate Commerce Act as amended (49 U.S.C.A. § 4), if the commodities are additional or auxiliary traffic (Alan Wood Steel Co. v. Alabama, G. S. R. Co., 190 I.C.C. 3, 21; Milk and Cream between New England Points, 126 I.C.C. 38, 60), "out of pocket" expense is a test (Commodity Rates to Mexico, 209 I.C.C. 370, 375; Roofing and Building Material to Florida Ports, 204 I.C.C. 291, 294; Export and Import Rates, 169 I.C.C. 13, 54; Transcontinental Cases of 1922, 74 I.C.C. 48, 68, et seq.).

(4) In reorganization proceedings, "the cash or equivalent investment at the time it is made" (Atlanta, B. & A. Ry. Co. Reorganization, 158 I.C.C. 6, 12) is the standard.

(5) In valuation proceedings, the "out of pocket" expense for transportation of construction items seems to be applied. San Pedro, Los Angeles & Salt Lake R. Co., 75 I.C.C. 463, 476, 477, 485; Clinton & Oklahoma Western Ry. Co., 116 I.C.C. 247, 249; Atchison, T. & S. F. Ry. Co., 127 I.C.C. 1, 24, 30, 31, 32; Great Northern Ry. Co., 133 I.C.C. 1, 9, 12, 13.

When we consider the nature of this kind of transportation (as being private carriage), the conditions under which it is undertaken (as being additional or fill in traffic), the obvious lower expense caused by it than by revenue traffic which moves under different and more expensive conditions, the accepted and applied method of estimating expenses for additional and auxiliary traffic and for special or auxiliary services, the application of the "out of pocket" test in commodity rates, reorganization and valuation proceedings—all by that Commission most familiar by experience with the complicated and complex matters of railway operations and finances —we are led to conclude that the proper measure for determining this transportation for construction cost is the "out of pocket" method. The actual cost is the goal, and we think this measure more nearly accords with the actualities of the situation than the "average cost" approved by the Board. This conclusion we deem not opposed to decisions like Northern Pac. Ry. Co. v. North Dakota, 236 U.S. 585, 596, 35 S.Ct. 429, 59 L.Ed. 735, Ann.Cas. 1916A, 1. That case dealt solely with expenses as between different classes or items of revenue traffic which is a situation depending upon different considerations from the transportation for construction purposes. Compare Atlantic Coast Line R. Co. v. United States (D.C.) 33 F.(2d) 130, 131, 132; Refrigeration Charges on Fruits,

etc., from the South, 151 I.C.C. 649, 664.

■ In so concluding we are conscious both of the difficulty of making a choice between these two methods and also of the practical difficulties of applying the "out of pocket" measure. As to the latter, it may be said that the Interstate Commerce Commission has repeatedly applied this measure, although it has also repeatedly recognized and stated the uncertainties and difficulties thereof.[6] However, if this is the measure intended by a proper construction of these taxing acts, mere difficulty of application thereof cannot excuse the Commissioner, the Board, and the courts from the burden of such difficulty. Where the evidence as to such measure in a particular case is too indefinite or uncertain or the results are opinions. or estimates not based on facts in evidence or lead to obviously improbable results, the Board and the courts may properly disregard such showing. Minnesota Rate Cases, 230 U.S. 352, 460, 465, 33 S.Ct. 729, 57 L.Ed. 1511, 48 L.R.A.(N.S.) 1151, Ann. Cas.1916A, 18; Chicago, M., etc., Ry. Co. v. Tompkins, 176 U.S. 167, 176, 20 S.Ct. 336, 44 L.Ed. 417; Great Northern Ry. Co. v. Commissioner, 40 F.(2d) 372, 373 (C.C.A.8).

### Petitioner's Evidence.

The last issue presented by petitioner is that its evidence constituted substantial proof "of the maximum amount of expense that could have been added to its ordinary and necessary operating expenses by the transportation in question, and the refusal of the Board to make findings thereon was an arbitrary denial of justice and an error of law." All of petitioner's evidence was directed to the "out of pocket" cost of this transportation. Being of opinion that "out of pocket" cost was not the proper measure for such expense and this evidence having little or no bearing upon the "average cost" measure approved by it, the Board naturally made no finding of ultimate fact upon this evidence. Upon rehearing, the Board will, of course, consider such evidence as well as any further evidence either of the parties may desire to introduce.

There is one matter concerning evidence which was discussed in the briefs here and which should now be determined to prevent a misconception and probably future mistrial. That matter is the showing made in petitioner's books and reported to the Interstate Commerce Commission under accounting heading "(VIII) Transportation for Investment Credit."

The amounts for expenses on account of transportation for construction purposes used by the Commissioner and approved by the Board for the respective years here involved were those thus appearing on the books of petitioner. The Board "presumed" that such amounts represented the expense of this transportation as measured by the "average cost" method approved by the Board. Since we disapprove that method and since this presumption would probably be held by the Board upon rehearing, it is necessary to examine and determine the verity of that presumption.

We find no evidence in this record to justify such presumption. Petitioner seeks to dispose of these book entries by saying that these were arbitrary entries and that "the issue here is actual cost, not proper methods of accounting." The matter cannot be disposed of so easily. True, we are not concerned with what are or are not proper accounting methods. However, we are much concerned with the showing of fact made in petitioner's books kept according to an accounting system and with what that showing is supposed to and should reveal as to the facts stated in accordance therewith. Therefore it is a matter of moment to know whether the book entries made by petitioner under "(VIII) Transportation for Investment Credit" are or are not intended, by this accounting system, to represent the actual costs—the "out of pocket" costs—of this transportation for construction.

The above accounting classification "(VIII)" was promulgated by the Commission, under the authority of section 20(5) of the Interstate Commerce Act, as amended (U.S.C.A., title 49, § 20(5), as a part of a system of accounting to be used by steam railroads. The same section made it "unlawful for such carriers to keep any other accounts, records, or

---

[6] Refrigeration Charges on Fruits, etc., from the South, 151 I.C.C. 649, 652; Commodity Rates to Pacific Coast Terminals, 107 I.C.C. 421, 432; Refrigeration Charges from Florida, 85 I.C.C. 247, 257, 259, 260; Arlington Heights Fruit Exchange v. Southern Pac. Co., 20 I.C.C. 106, 109.

memoranda than those prescribed or approved by the commission." This system of accounting was designed truly and completely to record the financial operations of the carrier. In discussing this system, the Supreme Court said: "The very object of a system of accounts is to display the pertinent financial operations of the company, and throw light upon its present condition." Kansas City Southern Ry. Co. v. United States, 231 U.S. 423, 440, 34 S.Ct. 125, 130, 58 L.Ed. 296, 52 L.R.A. (N.S.) 1.

In this system of accounting, Congress "recognized the essential distinctions between property accounts and operating accounts, between capital and earnings" (Id., 231 U.S. 423, at page 443, 34 S.Ct. 125, 131, 58 L.Ed. 296, 52 L.R.A.[N.S.] 1), and "manifested a purpose to standardize and render uniform the accounts of the different carriers with respect to matters that entered into property and the improvements, thereof, on the one hand, and the current operations of the company, on the other" (Id., 231 U.S. 423, at page 442, 34 S.Ct. 125, 131, 58 L.Ed. 296, 52 L.R.A.[N.S.] 1). Such distinction in accounts was "essential to the execution by the Interstate Commerce Commission of the supervisory and regulatory powers conferred upon it by Congress." Id., 231 U.S. 423, at page 445, 34 S.Ct. 125, 132, 58 L.Ed. 296, 52 L.R.A.(N.S.) 1.[7] The Commission thoroughly understood the necessity for such division in its system of accounting and particularly so as concerned with expenditures.[8]

In pursuance of its intention carefully to separate all items of capital expenditures from operating expenditures, the Commission set up this classification "(VIII) Transportation for Investment Credit," and defined its scope as being actual expenditures to other lines for carriage of men and material for construc-

---

[7] The court (231 U.S. 423, at pages 444, 445, 34 S.Ct. 125, 132, 58 L.Ed. 296, 52 L.R.A.[N.S.] 1) said:

"We are thus brought back to the fundamental distinction between (a) the property or capital accounts, designed to represent the investment of the stockholders, and to show the cost of the property as originally acquired, with subsequent additions and improvements; these assets being balanced by the liabilities, including the amount of the capital stock and of bonded and other indebtedness, with net profits or surplus, whether carried under the head of 'profit and loss' or otherwise; and (b) the operating accounts, designed to show, on the one side, gross receipts or gross earnings for the year, and on the other side, the expenditures involved in producing those gross earnings and in maintaining the property, the balance being the net earnings.

"Since the regulation of the railroad carrier by the public authority, and especially the fixing of the rates to be charged, depend primarily upon two fundamental considerations, (a) the value of the property that is employed in the public service, and (b) the current cost of carrying on that service, it is clear that the maintenance of a proper line of distinction between property accounts and operating accounts is essential to the execution by the Interstate Commerce Commission of the supervisory and regulatory powers conferred upon it by Congress."

[8] In St. Paul and Puget Sound Accounts, 29 I.C.C. 508, at pages 509, 510, the Commission said: "It is not our purpose here to discuss the principles underlying these classifications [for accounting]. It will suffice to say that one of the points in greatest need of regulation from an economic point of view, as disclosed by the previous delinquencies in the accounting of railroad companies, was the drawing of a correct line between expenditures for property and expenditures for operation. The need of such a distinction in railroad accounts is elementary; nevertheless, all students of railroad economics are well aware of the fact that, prior to 1907, when the Commission was given real power to control such matters, the accounts of carriers in many cases were influenced more by other considerations than by a desire to reflect the actual facts. A financially strong road making large net earnings would not hesitate to conceal the facts by adding to its operating-expense accounts sums disbursed in improving its property; on the other hand, a financially weak road, seeking to enhance its credit by a good showing of operating results, would include in its property accounts sums expended in operation. The result was that a carrier's annual and monthly statements of net revenue often reflected nothing more than the particular showing desired by its executive. These reports were often used for speculative purposes, and the stockholder and the general public were left without any assurance as to whether the dividends declared were paid from income or surplus or out of capital.

"A correct statement of the property account of a carrier is of scarcely less importance than a correct statement of its expenditures for operation."

tion purposes and "fair allowances representing the expense" of such carriage on its own lines. That by such "fair allowances" it meant the actual—"out of pocket"—expense we think clearly shown from the utterance of the Commission.[9]

What the Commission required the carrier to state under classification "(VIII) Transportation for Investment Credit" is precisely the same fact in controversy here—the actual expense of transportation over the carrier's own lines of men and materials for construction purposes. It is of no consequence that ascertainment of that fact may have been for different uses under the Interstate Commerce Act and under these taxing acts—the *fact* is the same, irrespective of its use. However, in reality, these uses are not essentially different. Under the Interstate Commerce Act, one of the prime reasons for ascertaining this fact was to arrive at net operating revenue for rate and other regulatory purposes; in the taxing acts, the reason is to arrive at the same net operating revenue for taxation purposes.

Therefore we conclude that the Board was in error in presuming that the amounts which petitioner's books showed under this accounting classification represented the "average cost" of all operating expenses. They were required to represent and must be regarded as representing, the amounts which petitioner thought, and intended the Commission to think, were its actual—"out of pocket"—expenses for this item.

In these tax proceedings, these book entries of petitioner are, of course, not conclusive, but petitioner "cannot now say that such entry in its own books for that purpose is not competent evidence of the facts supposed to be represented thereby." Great Northern Ry. Co. v. Commissioner, 40 F.(2d) 372, 373 (C.C.A.8). Where a carrier making such entries contends that the facts are not as stated therein, such entries are evidence, being statements against interest. As applied to these controversies, the result is that such entries made by this petitioner are evidence of the "out of pocket" expenses for transportation over its own lines of men and

[9] In St. Paul and Puget Sound Accounts, 29 I.C.C. 508, at pages 510–513, quoted from in footnote 8, supra, the Commission said:

"But in promulgating its classification of expenditures for road and equipment in 1907, at which time the Commission was first given effective authority to prescribe a system of accounts and to enforce its observance, the fundamental rule laid down by the Commission was that all entries in the accounts of a carrier under that head should be in terms of cash only, thus showing what it cost to create the property at 100 cents on the dollar. The general basis for the rule was that a correct statement of the investment is the beginning of correct accounting; and this sound principle gives us a balance-sheet statement of cost that is a record of the actual investment. * * *

"It intersects the Northern Pacific at a number of points and traverses much of the territory occupied by that line. By availing itself of the services of the Northern Pacific for the transportation of materials, the St. Paul Company was therefore enabled to carry on the construction of the new line from several different points at the same time, thus greatly facilitating and expediting the work. * * * During the period of construction * * * the St. Paul Company transported men and materials for the construction of the new line. * * * Under the accounting rules of the Commission the

St. Paul Company was permitted to include in its accounts a proper revenue for such transportation. * * *

"The Puget Sound line was opened for regular commercial traffic on August 1, 1909. Its first annual statistical report was filed with the Commission for the eleven months ending June 30, 1910. During that period the road moved a large revenue traffic and at the same time was engaged in completing the construction, more particularly, of its branch lines. In consequence of this condition of affairs expenditures for construction were made while expenditures for operation were also going on. In accounting for these two classes of expenditures for entirely different purposes, large amounts were included in the cost of construction that should have been entered up as expenses of operation. This course resulted in an inflation of the property account and at the same time made an unwarrantably good showing of the returns from operation. * * * Revenues were overstated by including charges for the transportation of construction material at rates substantially higher than those exacted under its published tariffs by the Northern Pacific. This was done notwithstanding the recognized practice of carriers to use rates on such materials which represent only the actual cost of the service. The result of this course was to augment both the revenues and the cost of property accounts."

materials for construction purposes in the respective years.

### Conclusion.

The results of the foregoing opinion are that the Board erred in the rejection of the "out of pocket" method or measure of determining these transportation expenses and in assuming that the entries made by petitioner in its books under classification account "(VIII) Transportation for Investment Credit" were based upon some other method or measure. In view of this opinion, the parties may desire to introduce other or further testimony and, if they do, should be accorded an opportunity.

The cases are remanded to the Board for proceedings not in conflict with this opinion.

